OPINION OF THE COURT
Stanley Gartenstein, J.
When society had finally destroyed Oscar Wilde’s will to live, he characterized the system of justice which relegated him to the jail he would never leave as enabling one to "see people and things as they really are. That is why it turns one to stone.” (Letter to Robert Ross, 1896.)
These thoughts are called forth as we consider an incredible chain of litigation dating back to May, 1972, which finally culminated in a joint trial before the undersigned on September 29, 1977. The proceedings to terminate the parental rights of a determined and courageous woman who has fought for her children with incredible tenacity have in fact been described by Mr. Justice Kupferman of the Appellate Division as "another example of how procedural blocks and the application of abstract principles can help to blight the life of a child.” (Matter of Yem, 54 AD2d 673, 674.)
After thousands of pages of testimony, pleadings, affidavits and reports, as well as countless appearances and emotional trauma to all concerned we are confronted in the final analysis, with the distasteful obligation of terminating this woman’s parental rights, not because a cause of action against her has been proven but because the law stands at a point where we must enunciate a doctrine of first impression to be delineated, for want of a better term as "no-fault” termination.
the facts [abridged for the purposes of publication] Two children are in issue, Suzanne age B-Vz and Hime, age 2-Vi. Suzanne was taken from her mother at age three weeks; Hime, at birth, in the hospital.
In May, 1972, Suzanne was taken from her mother in neglect proceedings based upon an incident in which the mother was found go-go dancing after midnight with the baby, then three weeks old, wrapped in a feces-soiled afghan. This temporary removal became long-term placement when the petition was sustained and ultimately became the basis for permanent neglect proceedings based upon the mother’s alleged failure to plan for her child in placement. In the interim Hime was born on March 10, 1975 and immediately removed *654 from the mother in the hospital by emergency order in separate neglect proceedings charging derivative neglect (Family Ct Act, § 1046, subd [a], par [i]). Suzanne’s termination proceeding and Hime’s neglect proceeding both came on for trial on July 8, 1975 at which time the mother did not appear and inquest and disposition were had on default. Based upon the judicial termination of parental rights as to Suzanne an adoption proceeding went forward and was favorably adjudicated in favor of the excellent adoptive parents who are the only parents Suzanne knows.
Thereafter, the biological mother moved to vacate her defaults based upon the fact that she had been handed a slip of paper calling for her appearance on July 9, 1975, one day after her defaults. The motion was denied and the mother appealed. On October 25, 1976, the order denying this motion was reversed (54 AD2d 673) to the extent of ordering a hearing on the issue of willfulness and on July 15, 1977, after hearing on this issue, the defaults were vacated and these proceedings set for trial before the undersigned. Additionally, termination proceedings as to Hime have now been commenced on similar grounds and are also before the undersigned. Both termination proceedings are also based on former subdivision 7 of section 384 of the Social Services Law (mental incapacity) as alternative causes of action, proceedings in which the Appellate Division ordered a mental examination of respondent as called for by statute.
The adoption of Suzanne, based upon an order of termination which is now a legal nullity, has never been attacked.
THE CASE AS TO SUZANNE
The entire case for termination of the mother’s parental rights to Suzanne rested on the testimony of a case-work supervisor who had no personal nexus to the case or the parties. Her sole function at the trial was to lay an evidentiary foundation for the introduction of the case record into evidence as having been kept in the ordinary course of business. The actual social workers with knowledge of this case and the parties have long since departed from the agency.
It was conceded that the mother was faithful in all her visits with her child, even to the extent of becoming almost a fixture in the home of the foster parents, until visitation was unilaterally terminated by agency decision. To support its claim that the mother failed to plan for Suzanne as required *655 by statute, petitioner made reference to case record entries, the most damaging of which contain hearsay conversations with a psychiatrist whose status is unclear; whose "diagnosis”, if that is what these chatty conversations may be called, is even more confused and ephemeral; and whose conversations with the caseworker about obviously privileged matter are of questionable ethics at best.
It further appears that the heart of this case seeking termination of the strongest and most basic relationship known to the law, that of parent and child, consists of three case record entries, each hearsay in its own right; each citing third and fourth degree hearsay. The entries consist of value judgments and social-work jargon with no relevance to the legal issues. Concisely, there is no hint of a prima facie case.
THE CASE AS TO HIME
The case for termination of respondent’s parental rights to Hime rests on the testimony of a caseworker who by her own testimony claims to be both the supportive worker to help the mother, and at the same time, the worker for the foster parents whose adverse interests go as far as an overwhelming desire to adopt Hime. Notwithstanding this inherent conflict of interest, this caseworker’s responsibility was to "evaluate” the mother’s plans for Hime and the "quality” (whatever that implies) of the mother’s visits with her child. It is conceded that the mother faithfully kept every visit she was allowed (except one) from August, 1975 to date. This in the face of the fact that these visits were penuriously doled out once a month; that they were held in the sterile surroundings of the agency; that the foster mother and the caseworker hovered over her, refusing to let her feed her child, play with her, or console her while crying. Under these circumstances, the mother was expected to build a rapport with her own child who was encouraged even in her presence, to look to the foster mother as the parent. It is further conceded that the mother constantly requested to take her child home and that she presented plans to live in an apartment which the worker rejected without investigation. It is claimed that the rejection of these plans was based upon respondent’s refusal of psychotherapy which the agency offered. At the same time, it is conceded that respondent claimed to be in therapy with a psychiatrist she refused to name. Because the biological mother would not accept therapy from a source she might *656 very well consider to be somewhat less than impartial (even to the extent of trying to prevail upon her with unrelenting regularity to sign a voluntary surrender of her rights to her child) and because she exhibited hostility to an instrumentality she considered to be working at cross purposes to her right to take her own child home, the court is now asked to conclude that she failed to plan realistically. In point of fact, respondent testified to a course of psychiatric treatment, naming her therapist on the record. This testimony was not controverted and as a matter of law is conclusive on the issue.
The foregoing constitutes the extent of the case as to Hime.
PSYCHIATRIC EXAMINATION
Although the alternate cause of action (alleged mental incapacity to care for the child) only went forward as to Hime, the court is willing to afford the widest possible latitude and consider it on Suzanne’s case as well; obviously, the issues on these alternate causes of action are the same.
Dr. Jerome H. Kessel, court-appointed psychiatrist, testified that the biological mother is not capable of caring for her children at the present time. At the same time, he concedes her tremendous improvement and prognosticated that she would be capable of doing so at a future time he can’t assess. He further testified that she can do extremely well with a continuation of the therapy she has had to date and that her proper use of prescribed medication is a very positive encouraging sign. Finally, he pointed out that the mother’s prior hospitalizations for mental illness were postpartum related, a factor which has no chance of recurrence in view of her age.
FINDINGS
The court finds that the testimony of Dr. Kessel fails to establish the statutory requirement that "[t]he parent * * * [is] presently and for the foreseeable future unable, by reason of mental illness * * * to provide proper and adequate care for a child * * * in the care of an authorized agency” (Social Services Law, § 384-b, subd 4, par [c]). Mental illness is defined by statute as "an affliction with a mental disease * * * which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to an extent that if such child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child as defined in *657 the family court act”. (Social Services Law, § 384-b, subd 6, par [a].)
The definition of a neglected child in the Family Court Act is contained in section 1012. It requires that a showing be made that the child does not receive a minimum degree of care. Nowhere does it recognize the nebulous criteria such as underlie the value judgments of the caseworkers herein. Not only did Dr. Kessel indicate that the biological mother was vastly improved, but he also took into account the fact that return of the children might be imminent by recommending a transition period if the court so ordered. The alternate causes of action as to both children are dismissed for want of proof.
. As to Suzanne, there is no evidence that the mother failed to "plan for the future of the child, although physically and financially able to do so” (Social Services Law, § 384-b, subd 7, par [a]). This cause of action is dismissed.
As to Hime, the court finds that the biological mother has visited her child whenever she could. She has done so under the begrudgingly granted schedule of one hour per month under circumstances where the foster mother and a caseworker she had good reason to believe was far from impartial hovered over her and did their best to make her feel unwanted and as an obstacle in the way of the proposed adoption. The court finds that she has evinced no failure to plan— indeed, has done so quite definitively and adequately in the face of the agency’s refusal even to investigate the feasibility of her plans. In the long run, every possible burden has been placed in her way: that of coming to the agency to visit; of having to prove that she could be allowed to play with her own baby; of proving that she received ongoing therapy; of proving feasible plans to persons who refused so much as to investigate them. This unfortunate attitude is far from isolated to this case or to this agency. It is no doubt spawned by the highest of motives. But in the long run, the children belonged to Mrs. Y and the burdens of care to the agency. And new attitudes are being expected from the social work establishment by virtue of a recognition that no instrumentality, however well intentioned, may distort the natural scheme of things by making a parent prove himself fit before he is judged capable of any rights to his own children. In short, the right to judge a parent belongs to no one. Rather, what does exist is a duty imposed by law to provide care when so requested; no more, no less. As recently enunciated by the *658 Second Circuit Court of Appeals in Duchesne v Sugarman (566 F2d 817):
"This action and the continued separation of the family by retention of custody was based on a unilateral and untested evaluation of the mother’s fitness as a parent. As Justice Stewart has very recently stated:
'If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children’s best interest, I should have little doubt that the State would have intruded impermissibly on "the private realm of family life which the state cannot enter.” Prince v. Massachusetts, 328 U.S. 158, 166.’
"Organization of Foster Families, supra, 45 U.S.L.W. at 4650 (Stewart, J. concurring).”
NO-FAULT TERMINATION
We turn now to Suzanne. In doing so, we consider a five and a half year-old adopted child who is happy and secure in a home she believes to be her only one. Removal from this home would destroy her. We refuse to take this action even in the face of a total failure of both causes of action as alleged.
The time has arrived when the law will recognize the necessity of terminating parental rights without statutory grounds when it is in the best interests of the child. This legal proposition which we shall call "no-fault” termination has been ever present albeit inchoate from the moment the Court of Appeals enunciated its historic decision in Matter of Bennett v Jeffreys (40 NY2d 543). From that time, it was obvious that there would arise a situation so clear-cut and unusual, that it could only be adjudicated on the basis of no-fault termination judicially declared as the ultimate logical application of Bennett v Jeffreys. Such a case would require the unpleasant but courageous stance that adjudication strictly on the basis of existing statutes would produce a result both grotesque and unjust; that its unique facts could be adjudicated only on the basis of language in Bennett v Jeffreys (supra, p 544) which in effect creates an additional ground for termination of parental rights outside of those enumerated by statute: "There should be a reversal and a new hearing before the Family Court. The State may not deprive a parent of the *659 custody of a child absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances. If any of such extraordinary circumstances are present, the disposition of custody is inñuenced or controlled by what is in the best interest of the child.” (Emphasis added.)
Again on page 546, the court stated: "The parent has a 'right’ to rear its child, and the child has a 'right’ to be reared by its parent. However, there are exceptions created by extraordinary circumstances, illustratively, surrender, abandonment, persisting neglect, unfitness, and unfortunate or involuntary disruption of custody over an extended period of time. It is these exceptions which have engendered confusion, sometimes in thought but most often only in language.” (Emphasis added.)
Finally, the court stated (p 548): "But where there is warrant to consider displacement of the parent, a determination that extraordinary circumstances exist is only the beginning, not the end, of judicial inquiry. Extraordinary circumstances alone do not justify depriving a natural parent of the custody of a child. Instead, once extraordinary circumstances are found, the court must then make the disposition that is in the best interest of the child.” (Emphasis added.)
If the emphasized portions are read with their plain meaning given effect, the Bennett court was apparently creating another category, exclusive of the statutory ones which would operate even where no prima facie case is otherwise presented, by virtue of which parental rights could be terminated if and when said action is in the best interest of the child. Obviously this can occur only in the most extreme circumstances. We have here these circumstances. We intend to act upon them.
It would seem logical that if a statutory basis to act does not exist in any given situation, the mandate to explore a child’s best interests rather than the outright dismissal warranted by statute would appear to signal the creation of a new nonstatutory "no-fault” cause of action. This also has the practical effect of making the entire statutory scheme almost irrelevant in the face of an overriding "best interests” rule.
Is this so or have we given the dictum in Bennett v Jeffreys inordinate importance? We have no way of telling unless and until the Court of Appeals has an opportunity — and one would guess this will be forthcoming with rapidity — to clarify its ruling therein and delineate precisely what its application will *660 ultimately be. One thing is clear: Bennett v Jeffreys has become the Dole v Dow of family law by virtue of a plethora of appellate and lower court holdings citing it as controlling on the widest possible range of cases. When all of its applications by lower courts are viewed with niceties cut away, we are left with one final verity, that the Court of Appeals was deciding a narrow issue of custody with broad language which has been given, validly or otherwise, the widest possible range of applications. Until the high court speaks again, we must flounder for our own answers. In doing so, our only guidance from the Court of Appeals exists in Matter of Sanjivini K. (40 NY2d 1025) in which the doctrine of Bennett v Jeffreys was cited in a permanent neglect case coupled with a clear mandate to lower courts to effectuate the "best interests” criteria even where a statutory scheme must be tailored accordingly. "We are prompted, however, in the circumstances disclosed in the record now before us to urge that all proceedings concerning the child be conducted to their final conclusions with dispatch, in the best interests of the child. To accomplish that result both the Family Court, because of its wide original jurisdiction, and the Appellate Division, given its broad power to review over facts and its equally extensive power to exercise discretion, may choose to initiate, consolidate, or review all proceedings heretofore initiated and any which may hereafter be brought. The subject of all these proceedings is a young child, and ingenuity and energy should be brought to bear, within the limits of due process of law and the applicable statutes, promptly to make appropriate provision for her welfare. It is not mere rhetoric to say that a child in need or distress is a ward of the State which exercises its powers parens patriae through the judicial branch.” (Matter of Sanjivini K., supra, pp 1026-1027.)
The problem with Sanjivini K. is the same as with Bennett: that is, having been decided almost simultaneously with Bennett, did the high court foresee that the onrush of cases following it would go as far as they did?
To illustrate how the statutory scheme has been made virtually irrelevant in reliance on Bennett v Jeffreys, one must simply consider Matter of House v Barbara J. (55 AD2d 604) in which a dismissal of a permanent neglect case was remanded for consideration of "best interests” by the trial court. Clearly, if no case was made out under the statute, consideration of anything further on the question of termina *661 tion — "best interests” or not — was either ultra vires to the statutory scheme or in pursuance of a new category of relief based upon "other extraordinary circumstances”. In either event, the difference between these two possibilities is obviously one of semantics. It simply means that every case to come before the court, whether provable by statute or otherwise, will be decided on "best interests” criteria. This conclusion is illustrated even more graphically in Matter of Kim Marie J. (59 AD2d 716, 717), in which the Appellate Division held the proceeding controlled solely on the no-fault basis of "extraordinary circumstances” stating: "Orders modified, on the law and the facts, by deleting therefrom the provisions which adjudge the infant to be a permanently neglected child and substituting therefor provisions that there are extraordinary circumstances here which affect the welfare of the child and which justify the termination of parental custody.” (To similar effect, see, Letitcia Rose M., 54 AD2d 909, and Matter of Jean Yvette E., 59 AD2d 907; see, also, Carrieri, Foster Child — Major Case Revisited, NYLJ, Nov. 1, 1977, p 1.)
These cases are probably the clearest indication of an appellate recognition that the importance of Bennett v Jeffreys appears to be the creation of a new nonstatutory category of no-fault termination, a concept we crystallize and apply herein.
Based upon this concept, we must take the only logical, albeit uncomfortable, step and declare Mrs. Y’s parental rights to Suzanne terminated. There is no more extreme case imaginable than the present one. We stress again that we are creating no new doctrine. We simply enunciate and crystallize the clear meaning of the Bennett court.
The situation with Hime, now two and a half, is different. There may yet be room to salvage. In all candor, the court does not have sufficient basis to determine her best welfare. Hime is still young enough and sufficiently pliable not to have her world collapse were we to order her return to Mrs. Y. Regrettably, we have no way of knowing whether or not this will benefit her. The one hour per month visitation under the jealous eye of a foster parent anxious to adopt in the office of the agency is obviously no barometer. Accordingly, the final determination as to Hime will await the report of her concerned Law Guardian after a three-month transition period during which Mrs. Y shall have Hime one full day every week to do and act toward her as every mother would, supervised *662 by a child care social worker from the Legal Aid Society whose time and effort have been volunteered to the court by Hime’s Law Guardian. These visits shall be set up by the impartial social worker who shall have plenary authority as to details thereof with the confidence and thanks of the court. Written reports shall be furnished to the undersigned with copies to all parties and counsel. The final determination shall be made in a dispositional hearing to be set by order upon receipt of the last of these reports, each of which shall form part of the record of these proceedings. The court shall retain jurisdiction during this period for interim relief on the application of any party.
As to Suzanne, this decision and order constitute a final judgment for purposes of appeal. The record on appeal shall be complete with the settlement and signature of a judgment providing for termination and a proposed scheme of visitation for the biological mother (see Matter of Raana Beth N., 78 Misc 2d 105; and Matter of Patricia A. W., 89 Misc 2d 368) which counsel are directed to settle on notice.
FINAL PERSPECTIVE
The ultimate violence to any lawyer’s discipline, and after all, that is what we are on both sides of the Bench — may be said to exist when a court must acknowledge that no prima facie case has been proven under a jurisdictional statute, but that it must nevertheless rule as if one had been. This is so because children of tender years are involved and the law has finally recognized that neither we nor the higher courts will destroy them by applying abstract principles of law. But there must be a better way. We have here been faced with a decision which has all but been dictated. In the long run, one of the most important goals of the law, if we view it as facilitating order in society, is predictability. If statutory grounds are met, one result follows; if not, the reverse is true. We are now in a situation without this predictability. It is most uncomfortable. When this is true, drastic changes would appear appropriate.
Where should the outrage generated by these circumstances be directed? Sober reflection shows that while we disapprove in part of the performance of every instrumentality having contact with this matter, including the court itself, the real blame lies with a socio-legal apparatus which simply is not responsive to the need for speedy determination of children’s *663 rights. Cases of this nature may ultimately prove that a marriage between the law and social work underlying the very creation of this court is doomed from the start. But before society prognosticates, it might be well to devote legislative and judicial energies to a long hard think as to why a process geared to providing answers leaves only the sharp questions raised herein.
It might be well to recognize that where we permit government-sanctioned agencies to make day-to-day judgments on which families shall remain together or be torn apart according to the value judgments of its concededly well intentioned workers, we approach the tyranny described by the Second Circuit Court of Appeals in Duchesne v Sugarman (566 F2d 817, —, supra): "[o]f all tyrannies a tyranny sincerely exercised for the good of its victims may be the most oppressive * * * [T]hose who torment us for our own good will torment us without end for they do so with the approval of their own conscience.”