In the Matter of Hime Y., Alleged to be a Permanently Neglected Child. Jewish Child Care Association, Appellant-Respondent; Elaine S. Y., Respondent-Appellant, and Sorikan Y. et al., Respondents.

First Department, March 11, 1980

APPEARANCES OF COUNSEL

*David H. Berman* of counsel *(Gerald E. Bodell,* attorney), for appellant-respondent.

*A. Isadore Eibel* for respondent-appellant.

*Janet R. Fink* of counsel *(Charles Schinitsky,* attorney), *Law Guardian* for Hime Y.

## OPINION OF THE COURT

MURPHY, P. J.

Upon the prior appeal in this proceeding, the majority reversed and remanded the matter for a new trial to determine whether parental rights should be terminated with regard to the older child, Suzanne. The reversal was based upon the fact that the Trial Judge had erroneously decided the case under a "no-fault" theory. *(Matter of Suzanne N. Y.,* 66 AD2d 723.) The dissenters believed that the evidence justified a finding of "permanent neglect", based upon the natural mother's failure to plan for the future of Suzanne. It should be emphasized that, upon that prior appeal, the Jewish Child Care Association (the "agency") did not appeal from that portion of the order as dismissed the cause of action alleging the natural mother (the "mother") was "mentally ill". (Social Services Law, § 384-b, subd 4, par [c]; subd 6, par [a].) Therefore, in its briefs, the agency only pressed the point that Suzanne was a "permanently neglected child". (Social Services Law, § 384-b, subd 4, par [d]; subd 7, par [a].) As thus limited by the agency's notice of cross appeal and its briefs, this court did not consider the merits of the cause of action alleging that the mother was "mentally ill".

The prior appeal did not concern itself with the mother's younger child, Hime. The Trial Judge had directed that a dispositional hearing be held with regard to Hime after a "three-month transition period" *(Matter of Suzanne Y.,* 92 Misc 2d 652, 661, 662). After holding the dispositional hearings in the fall of 1978, the Trial Judge dismissed the termination proceedings relating to Hime but he granted custody to the foster parents with liberal visitation privileges accorded the mother *(Matter of Suzanne Y.,* 95 Misc 2d 733). Upon the present appeal, the agency now presses its contention that the natural mother is "mentally ill". For the first time, we scrutinize the record with a view to determining the merits of that contention.

Since the Trial Judge found that the causes, relating to Hime, were meritless, there was no predicate for holding a dispositional hearing with regard to Hime *(Matter of Corey L v Martin L,* 45 NY2d 383, 391). Consequently, we consider the so-called "dispositional hearings", held in the fall of 1978, to the limited extent that they furnish additional information concerning the mother's mental status.

Because one cause in the petition asserted that the mother was "mentally ill", the Trial Judge correctly appointed a psychiatrist, Dr. Kessel, to examine the mother. (Social Services Law, § 384-b, subd 6, par [e].) While there is an indication in the decision that the Trial Judge considered Dr. Kessel's report and testimony, there is no indication that he considered the "other psychiatric, psychological or medical" proof marked in evidence *(ibid.).* There is an indication in the decision that the Trial Judge discounted the evidentiary value of the caseworkers' testimony and the agency's case records insofar as they related to the mother's mental status. (92 Misc 2d 652, 655.) Upon this appeal, we shall consider all the unchallenged reports and records received in evidence. Furthermore, we shall accord the caseworkers' testimony significantly more credit and weight than was accorded it by the Trial Judge.

■ By her own testimony, the mother had gone to countless psychiatrists over the years. In many cases, the mother's sole purpose in going to a particular psychiatrist was in the hope of eliciting his testimony at a prospective trial. Nonetheless, the mother did not call one psychiatrist on her behalf in any of these proceedings. Moreover, the record shows that the mother vigorously resisted any attempts by the agency to gather information as to her mental status. The only evidence submitted by the mother on this subject was a letter from the medical director of the Institute of Religion and Health. This letter merely stated that the mother had been faithfully coming to therapy sessions and that she continued to make progress. This letter was silent on the critical question of whether the mother could then care for her children. In view of the mother's failure to call any psychiatrist or to adduce any other evidence bearing upon her mental fitness, this court, as a finder of fact, must draw an unfavorable inference with regard to the evidence thus withheld. (Richardson, Evidence [10th ed], § 92, p 65.) Against this background, our

factual findings and legal conclusions differ significantly from those of the Trial Judge.

The record provides but a hint as to the mother's mental history prior to 1971. However, in an examination on February 13, 1973, the mother did tell a clinic psychiatrist, Dr. Robins, that she "heard voices" as early as 1964. In 1971, she was hospitalized for at least three months in the Elmhurst Mental Institution. There is an indication in the report of a psychiatrist, Dr. Kaplan, that this first hospitalization occurred when the mother was arrested for trespass after being unable to pay rent and refusing to vacate an apartment. According to Kaplan's inspection of the Elmhurst records, the mother had delusions of persecution at that time. The mother testified that she was convicted of criminal trespass in 1971 and that she was incarcerated for 90 days. It is not clear from this record whether her hospitalization in Elmhurst Mental Institution arose from that conviction or was itself a separate incident.

Suzanne was born on April 15, 1972. In the early morning hours of May 10, 1972, the police found the mother dancing in a bar with Suzanne in her arms. The police report indicated that Suzanne was then wrapped in a feces-soiled afghan. The mother was admitted to Bellevue Hospital's psychiatric division; Suzanne was placed with a foster family. The agency's case records reveal that Dr. Lloyd Siegel, who had been the mother's personal psychiatrist for about one year prior to this occurrence, stated that she probably had a lifelong history of marginal adjustment. Siegel further noted that his patient had little insight into her emotional instability. In September of 1972, Siegel was of the opinion that she was not ready to take Suzanne home. There is proof that this second hospitalization may have been postpartum related. However, Dr. Kessel states in his report that the second hospitalization may have been precipitated by the fact that the mother's husband and his friends had been "playing with a gun" in the parties' apartment.

Dr. Robins examined the mother on February 13, 1978. His diagnostic impression was that she was suffering from "Schizophrenia, chronic undifferentiated type, in partial remission or control". He found that the natural mother was not capable of caring for her child. Dr. Robins' subsequent report, based upon his examination of August 17, 1973, varied in only minor detail from his earlier report. In concluding his latter report,

Dr. Robins stated: "The outside information obtained from the foster home by this examiner indicates grossly psychotic behavior which correlates with the findings in a psychiatric examination. From a psychiatric point of view, she appears definitely unable to care for her child, and requires close supervision in visitation."

The natural mother was hospitalized in Metropolitan Hospital from May 21, 1974 until June 14, 1974. This third admission was diagnosed as an "acute schizophrenic episode". There is a suggestion in Metropolitan's records that the mother was hospitalized when she attempted to jump from a window while she was fleeing from her husband.

Hime was born on March 10, 1975; she was fathered by the natural mother's paramour rather than by her husband. On April 1, 1975, the mother was found walking the streets with Hime. Again, the mother was admitted to Bellevue's psychiatric division; the child was placed with foster parents. The mother remained in Bellevue until June 26, 1975. Dr. Ross, her psychiatrist in Bellevue, diagnosed her condition as schizophrenia.

Dr. Smith, a senior psychologist, examined the natural mother on April 18, 1977. He found that her schizophrenia was in partial remission. It was his belief that she could not adequately care for her children.

Dr. Kessel, the court-appointed psychiatrist, also concluded that the mother was afflicted with a residual form of schizophrenia. At trial, Dr. Kessel testified that she was not capable of caring for the children. He did allege that it was possible that at some future date she might be able to take care of the children. However, Dr. Kessel could not set a date absolute when the mother might be able to care for the children.

Dr. Kaplan, the psychiatrist retained by the Legal Aid Society, examined the mother on three separate occasions; the last examination occurred on June 5, 1978. Dr. Kaplan reached the following diagnosis: "Manic depressive illness—unipolar manic type—in remission". She recommended that Hime stay with the foster parents because the natural mother had a psychotic disorder marked by episodic exacerbations. This psychiatrist emphasized that the natural mother had no family to back her up in the event of future episodes.

Miss Davidson, an agency caseworker, also testified that the mother's behavior on visiting dates was often bizarre. She

testified, *inter alia,* that the mother had crawled on the floor with a stuffed animal, cried, whimpered, talked to the walls, screamed, and abused the agency's workers.

In July of 1974, the mother left her husband and went to live with her paramour in a "seven room penthouse". The penthouse was also occupied by the paramour's "girl friend" and his brother. The "girl friend" was actually a policewoman who had become pregnant by the paramour. The mother testified that neither she nor the "girl friend" was supposed to be aware of each other's existence in the penthouse. By her own testimony, the mother had hoped to bring both her children to reside in the penthouse. However, a disagreement with her paramour forced her to move to a small apartment in that same building. This phase in the mother's life is recounted to demonstrate that the mother's "mental illness" undoubtedly affected her ability to make a sound value judgment with regard to the upbringing of her children. No mother, possessing all her mental faculties, would entertain the thought of bringing her children into the unseemly surroundings described in the penthouse.

Very little is known of the mother's employment history for she again refused to disclose pertinent information in that area. The record does reveal the fact that she is receiving SSI benefits, in an undisclosed amount, for her nervous condition. No support was being received from her husband or her paramour. She testified that, if Hime or Suzanne were returned to her, she would seek additional public assistance to support them. For purposes of further discussion, we shall not dwell upon the issue of whether the mother could support Hime if that child were returned to her. It will be assumed that she would receive sufficient public assistance so as to be "financially able" to care for herself and the child (Family Ct Act, § 1012, subd [f], par [i], cl [A]).

With this "financial" issue removed from the case, the mother's employment history becomes relevant insofar as it is attributable to and a reflection of her own "mental illness". Because of her frequent hospitalizations and periods of exacerbation, she admittedly was unable to hold a steady job since 1974. Her intermittent and erratic employment record is symptomatic of her own mental instability. Moreover, in the absence of any apparent support from relatives or friends, it portends a crisis for any child left in her care upon her next serious episode. From time to time, the mother has partially

supported herself in such diverse pursuits as "go-go" dancing and "semi-nude" modeling. Her movie credits include "The Silent Bed of Violence". These part-time "jobs" do not buttress her contention that she would be a fit parent.

The medical evidence establishes that between 1971 and 1978 there has been no measurable change in the mother's mental status. Every psychiatrist, from Dr. Siegel to Dr. Kaplan, concluded that she could not care for her children. It should be stressed that Dr. Kessel shared the opinion of his colleagues. He could not state a definite date in the "foreseeable future" when the mother might be able to care for her children. Surely we cannot sit back patiently in the hope that the mother will, at some unknown future date, become readjusted under psychiatric treatment. The statute requires that we act now to protect the children.

■ The "clear and convincing" proof (Social Services Law, § 384-b, subd 3, par [g]) in this record has established that Hime would be in danger of becoming a "neglected child" (Family Ct Act, § 1012, subd [f]) if she were returned to the mother because of the mother's "mental illness". Over the years, the mother has been maintained on continual medication to remain minimally functional. She cannot be trusted, either now or in the foreseeable future, to supply the child with necessaries, even if financially able to do so (Family Ct Act, § 1012, subd [f], par [i], cl [A]), or to provide the child with proper supervision (Family Ct Act, § 1012, subd [f], par [i], cl [B]). While the mother's attendance record shows some interest and concern for the children, the overriding consideration remains that her "mental illness" effectively prevents her from properly caring for them. Therefore, it is necessary to terminate her parental rights to Hime.

Since the mother has been found "mentally ill", it necessarily follows that she was not "physically able" to plan for the future of the child (Social Services Law, § 384-b, subd 7, par [a]). Hence, the cause of action based upon "permanent neglect" must be dismissed as academic.

Accordingly, the order of the Family Court, New York County (GARTENSTEIN, J.), entered January 26, 1979, which, inter alia, dismissed both causes in the petition relating to Hime, should be modified, on the law and the facts, by granting the petition on the ground that the mother is "mentally ill", by vacating so much thereof as granted the mother liberal visitation privileges, and by remanding the matter for

further proceedings, and, as modified, the order should be affirmed, without costs.

BIRNS, MARKEWICH and BLOOM, JJ., concur.

Order, Family Court, New York County, entered on January 26, 1979, modified, on the law and on the facts, by granting the petition on the ground that the mother is "mentally ill," by vacating so much thereof as granted the mother liberal visitation privileges, and by remanding the matter for further proceedings, and, as modified, the order is affirmed, without costs and without disbursements.