■ In the Matter of SANJIVINI K., a Child Alleged to be Neglected. ROCKLAND COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; USHA K., Appellant.—In a proceeding pursuant to section 392 of the Social Services Law to review the foster care status of the subject infant Sanjivini K. (Sandy), the natural mother, Usha K., appeals from an order of the Family Court, Rockland County, dated February 14, 1975, which, after a hearing, *inter alia,* directed that (1) the foster care status be continued, (2) the Commissioner of the Department of Social Services institute a proceeding to legally free the infant for adoption and, upon failure of his department to do so within 30 days after entry of the order, gave permission to the foster parents with whom the infant resides to institute such a proceeding and (3) unless a proceeding to free the infant for adoption was commenced by the termination of "said three-month period", the placement of the infant

should terminate forthwith and the child shall be surrendered immediately by the commissioner and the foster parents to the natural mother, and that all rights and responsibilities of the department and the foster parents "shall wholly cease". (We note that the appeal by Usha K. from a prior order of the same court, dated June 26, 1974, was dismissed by order of this court dated December 4, 1975, pursuant to section 670.4 (subd [a], par [5]) of the rules of this court, 22 NYCRR 670.4 [a] [5].) Order reversed, on the law and the facts, without costs or disbursements, and it is directed that the subject infant, Sanjivini K., be returned to her natural mother, appellant Usha K., by August 31, 1976. The determination of whether the foster care status should have been continued hinged upon whether it was "in accordance with the best interest of the child" (see Social Services Law, § 392, subd 7). The Department of Social Services' file, which was placed in evidence at the hearing held on the subject application in November, 1974, contains an intake history and a subsequent department diary of the circumstances under which Usha K. came to this country and what befell her. We learn therefrom, and from the other papers in the record on this appeal, that Usha was the only child of an Indian couple and was raised in a small village near Bombay. Her father, a bank auditor, died when Usha was 12 years old. Usha was then raised by her mother. There was no schooling or employment for children in Usha's village and, therefore, at the age of 13, she went to Bombay to live with a distant relative and to make a living. She took secretarial training and, at the age of 14, was working at a full-time day job and going to school at night. She did this so that she and her mother could save enough money for Usha to come to this country to get a college education. Usha came to the United States in January, 1962 and obtained a student visa in the hope of getting an education in the field of nutrition. A department case note of March 31, 1966 states that "Usha has been in the US studying since January 1962 * * * She has been in 3 colleges altogether". In 1964 Usha's mother died in India. The department note of March 31, 1966 also states that "Usha is an orphan. * * * She has no siblings or close relatives. She seems to be completely alone." The department files report that Usha became pregnant by a young Indian student who was supposed to properly marry her, but who abandoned her during pregnancy, and that: "Usha does not want to give her baby for adoption. However, she does want temporary plans made for this baby for about 2 years, so she can complete her college education and then be able to care for and support the baby herself. Usha's real and only interest is in this 2 year temporary foster care for her baby." Usha gave birth to Sandy on May 2, 1966 in a hospital in Rockland County and, on May 21, 1966, voluntarily placed the infant with the Department of Social Services for temporary foster care. The department immediately placed the child in a foster home in the care of Mr. and Mrs. James B., where the child remained until late 1968. She was then placed in a foster home in the care of Mr. and Mrs. Robert C. of Nanuet, Rockland County, where the child has resided to date. That family also has two adopted daughters. It is quite clear that the environment in that home is warm, constructive and wholesome, that Sandy has been happy and is thriving there, and that she would even like to be adopted by the foster parents. In the course of Usha's studies, her student visa expired. In May, 1967 she was facing immediate deportation; the Immigration Service sought to have the child accompany her. The Department of Social Services was advised by the Immigration Service that the welfare of the child in *India* was not a matter for the Immigration Service's concern and that Usha could not remain in this country even though her

child was a citizen by virtue of her having been born in the United States. The Department of Social Services then procured Legal Aid Society counsel to aid Usha to legalize her status. However, the department was also concerned that the child not be deported with Usha should Usha's legal efforts to prevent her deportation fail. Accordingly, the Department of Social Services filed a neglect petition in the Family Court, Rockland County, under (the now repealed) article 3 of the Family Court Act. On June 14, 1967 a temporary order of placement was made by that court. The order also contained directives obviously designed to forestall the deportation, to gain time and to induce the Immigration Service to permit Usha and her baby to be reunited. Thereafter, based upon the aforesaid article 3 petition, on December 4, 1968, an order of disposition was made (after an adjudicatory hearing), reciting that the subject infant was a neglected child; the court placed the child with the department for 12 months. The order expressly stated, however, that, "the Court has no finding concerning any acts of the mother that might have constituted a neglect. Therefore, that matter is not determined at all." Thereafter, this placement was extended periodically. In the meantime, by means of scholarships and part-time employment, Usha completed her studies. Majoring in agriculture and nutrition, she obtained a bachelor's degree from the University of Maryland and, after studies at the University of North Carolina, obtained a masters degree. She had difficulty obtaining work in her field because she was a woman and a foreigner whose immigration status was clouded in uncertainty. She engaged in various proceedings and measures to forestall deportation and to legitimize her status into that of an alien admitted for permanent residence—a status which would enable her to gain consistent employment and which could lead to citizenship. The Department of Social Services' file indicates that, consonant with these burdens, she persistently kept in touch with, and visited, her child. Usha now has an apartment in New York City and is employed. A Department of Social Services representative testified that the apartment is "nicely furnished with moderate accommodations but adequate" and that it seems to be in "a nice neighborhood and it is in a nice area", with other residential housing nearby and a playground within a few blocks. In anticipation of the return of her child, Usha has ordered a sofa, contacted a public school and has made arrangements for Sandy to be transported home from school and for after-school day care. The record further indicates that there is a significant possibility that Usha's immigration status will ultimately be stabilized and validated. Usha wants her child returned, but the department applied for a further extension citing, *inter alia,* a six-month gap in visitation in 1974 and suggesting that Usha places her interests before those of the child, is unstable, makes unjust accusations and seeks the child as a means of remaining in this country. In our opinion the evidence clearly establishes that the six-month gap in visitation in 1974 was caused only by misunderstandings generated by Usha's strong desire to re-establish a full and normal relationship with her child. The record certainly does not establish that Usha abandoned her child or is an unfit mother. To the contrary, under the most trying circumstances, Usha manifested qualities of courage, industry, persistence and intelligence, and those characteristics cannot be turned against her to indefinitely deprive her of her child. Under all of the circumstances herein, it is in accordance with the best interests of the child that she be returned to her natural mother, the appellant (see *Matter of Rodriguez v Dumpson,* 52 AD2d 299, where the court directed the return to a blind mother of custody of her three-year-old son who had been placed with

foster parents shortly after his birth; *Matter of Bennett v Jeffreys,* 51 AD2d 544; *State of New York ex rel. Wallace v Lhotan,* 51 AD2d 252, mot for lv to app den 39 NY2d 705; *Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196). As noted in *Matter of Rodriguez v Dumpson (supra,* p 302): "The reasons for denying a mother's claim to custody must be weighty *(People ex rel. Portnoy v. Strasser,* 303 N. Y. 539, 542) and 'compelling' *(Spence-Chapin Adoption Service v. Polk,* 29 N. Y. 2d 196, 199.) The rationale for imposing such a heavy burden was succinctly stated (and quoted with approval in *Scarpetta v. Spence-Chapin Adoption Service, supra)* in *People ex rel. Grament v. Free Synagogue Child Adoption Committee* (194 Misc. 332, 337–338): 'So important is the status of a natural parent, that in determining the best interests of the child, it may counterbalance, even outweigh, superior material and cultural advantages which may be afforded by adoptive parents * * *. For experience teaches that a mother's love is one factor which will endure, possibly endure after other claimed material advantages and emotional attachments may have proven transient.' " Latham, Acting P. J., Cohalan, Rabin, Shapiro and Titone, JJ., concur.