■ In the Matter of SANJIVINI K., a Child Alleged to be Neglected. ROCKLAND COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; USHA K., Appellant.—In a permanent neglect proceeding pursuant to part 1 of article 6 of the Family Court Act, Usha K., the natural mother of the subject infant, Sanjivini K., appeals (by permission) from an order of the Family Court, Rockland County, dated March 1, 1976, which, after a fact-finding hearing, adjudged that the infant is a permanently neglected child and set the matter down for a dispositional hearing. On the court's own motion, the notice of appeal is deemed amended so as to show that it is also from an order of disposition of the same court, dated May 28, 1976, which, after a hearing, *inter alia,* directed that "custody of said child * * * is awarded to Department of Social Services * * * (upon the following terms and conditions: Department of Social Services is to immediately make arrangements for adoption)" (see CPLR 5520, subd [c]). Orders affirmed, without costs or disbursements. We find present "extraordinary circumstances" requiring affirmance (see *Matter of Bennett v Jeffreys,* 40 NY2d 543; see, also, *Matter of Sanjivini K.,* 40 NY2d 1025, revg 53 AD2d 863). As a result of Usha's travails and her inability to obtain a job in Rockland County, the uncertainty of her immigration status and her inability to develop a more intimate relationship with her daughter, as well as the fact that the child has been with foster parents since her birth (May 2, 1966) and for the past 10 years has lived in a stable, constructive environment, with the result that she is a healthy and well-adjusted child, it would now be extremely traumatic to rip the child from that environment and also subject her to a possible return to India, a prospect which appellant herself once thought not to be in the child's best interest. (Appellant sees no risk now because the child is older.) The dissenters would remand this matter for a so-called *"Bennett*-type" hearing. We would merely note that presently there is a complete record before this court containing a plethora of facts pertaining to the conduct and activities of the natural mother and the impact of the past 12 years upon the child. Clearly, the record establishes that the best interests of the child would be served by affirmance. Viewed from the standpoint of the impact on the child, a *de facto* permanent neglect must be deemed to have been established. Mollen, P. J., Margett and Hawkins, JJ., concur; Suozzi, J., dissents and votes to reverse the orders, etc., with the following memorandum, in which Gulotta, J., concurs: I would (1) reverse the orders appealed from, (2) convert the permanent neglect proceeding to

one to determine the best interests of the child pursuant to *Matter of Sanjivini K.* (40 NY2d 1025, 1026-1027, revg 53 AD2d 863) and *Matter of Bennett v Jeffreys* (40 NY2d 543) and (3) remand the proceeding to the Family Court for a full hearing and withhold a final determination as to the status of the child and the respective rights and obligations of the natural mother and foster parents pending the determination to be made after the new hearing. In the meantime, visitation between the child and the natural mother should be continued if it has not heretofore been discontinued, or resumed if it has been discontinued. The Family Court found that the child was permanently neglected as defined by section 611 of the Family Court Act because of the mother's failure to plan for the child's future, notwithstanding the diligent efforts of the Department of Social Services to "encourage * * * the parental relationship" with this child, as a result of which this child has been living for 10 years with foster parents whom she now considers her parents. As in the case of a finding that a natural parent has surrendered or abandoned her child, or is an unfit parent, this finding deprives the parent of custody, frees the child for adoption, terminates the parent's right to veto an adoption and to visit with the child and extinguishes all other rights and obligations of the parent. The majority, in affirming the orders, has reached the same result as the Family Court, but has done so on an entirely different ground, which implicitly rejects and reverses the factual finding of permanent neglect made by the Family Court pursuant to section 611. I agree with my colleagues in the majority in their rejection and reversal of this finding, since there is no factual basis for it. The records of all the prior proceedings since 1966 disclose that except for the finding of permanent neglect herein, no similar finding has been made during the 12 years encompassed by this litigation. In fact, the Family Court, in January, 1974, in a similar proceeding, dismissed the proceeding for lack of evidence. That order, which was not appealed and, therefore, was final and conclusive, exonerated this parent of any fault over the eight-year period which antedated that order. There is no basis for such a finding during the period subsequent to that order, because the separation of parent and child over the past four years is directly attributable to the less than expeditious pace with which the subsequent proceedings have progressed through that court and the appellate courts since January, 1974. In the foster care review proceeding which immediately preceded this neglect proceeding, this court absolved the parent of any fault, finding that the "six-month gap in visitation in 1974 was caused only by misunderstandings generated by Usha's [the natural mother's] strong desire to re-establish a full and normal relationship with her child" *(Matter of Sanjivini K.,* 53 AD2d 863, 865, *supra).* The proceeding which resulted in the orders appealed from, was commenced 12 days after the Family Court order involved in the earlier appeal was made and, therefore, calls for the evaluation of substantially the same conduct of the parent as was appraised so favorably by this court in that earlier appeal. We stated (p 865): "The record certainly does not establish that Usha abandoned her child or is an unfit mother. To the contrary, under the most trying circumstances, Usha manifested qualities of courage, industry, persistence and intelligence, and those characteristics cannot be turned against her to indefinitely deprive her of her child." Having rejected the Family Court's factual finding of permanent neglect (which is the *sine qua non* of the permanent neglect order presently on appeal), and absent any other findings of fact to review herein, the reversal of the orders appealed from is inevitable. The majority, however, purportedly relying on *Matter of Bennett v Jeffreys* (40 NY2d 543, *supra)* and

*Matter of Sanjivini K.* (40 NY2d 1025, revg 53 AD2d 863, *supra),* the latter involving the same parties in a foster care review proceeding, does not dismiss the permanent neglect proceeding but, instead, affirms the orders of the Family Court on a finding of *"de facto* permanent neglect" arising out of the extraordinary circumstances created by the child's long-term placement with foster parents (the child had been in foster care for 10 years as of the date of the orders appealed from, and about 12 years at the present time). I disagree with my colleagues in the majority because they are enunciating a new principle of law based on a newly invented concept of *"de facto* permanent neglect" for which there is no statutory authority or decisional precedent. The majority, in effect, proclaims that the presence of extraordinary circumstances arising out of this child's long-term placement in foster care constitutes *"de facto* permanent neglect" which, as a matter of law, authorizes and mandates a denial of custody to the natural parent and allows this child to be adopted without the mother's consent, effectively extinguishing all the natural parent's rights. The net result of the majority's action is a conclusive determination of the status of the child and the rights and obligations of the respective parties to this proceeding. To reach this result, the majority purports to decide the "best interests of the child" without the benefit of a *Bennett*-type hearing, as required by *Bennett* and directed by the Court of Appeals in *Matter of Sanjivini K.* In addition to usurping the original jurisdiction of the Family Court, it does so on the basis of a record which (1) is a replica of the record in *Matter of Sanjivini K.,* which the Court of Appeals branded as insufficient for the determination of such crucial issues, and (2) was made before the *Bennett* standards were enunciated. At the same time the majority extinguishes all of this natural parent's rights as to custody, visitation and adoption in the absence of any finding of unfitness, surrender, abandonment, or permanent neglect which, as the Court of Appeals reiterated in *Bennett,* was a prerequisite for any such drastic action *(Matter of Bennett v Jeffreys,* 40 NY2d 543, 544, *supra).* I submit that the majority is misconstruing the principles of *Bennett* and misreading the Court of Appeals conclusion in *Matter of Sanjivini K.* (40 NY2d 1025, 1026, *supra)* that "The interests of the child, her natural mother and her foster parents will best be served by resolving the status of the child and the rights and obligations of the parties in that permanent neglect proceeding in conformity with the standards we have enunciated *(Matter of Bennett v Jeffreys,* 40 NY2d 543)." The majority, in bypassing the *Bennett* hearing to determine the "best interests of the child", and in reaching its result on the present record, is venturing far beyond the frontiers reached by *Bennett* and is charting a new and extraordinary approach to the termination of parental rights which finds no support in either *Bennett* or *Sanjivini K.* As a consequence, this natural parent will be unceremoniously drummed out of the life of her child in the face of this court's findings of fact in the earlier appeal which, in my view, are still in full force and effect and binding here, to wit, "The record certainly does not establish that Usha [the natural mother] abandoned her child or is an unfit mother. To the contrary, under the most trying circumstances, Usha manifested qualities of courage, industry, persistence and intelligence, and those characteristics cannot be turned against her to indefinitely deprive her of her child" (53 AD2d 863, 865, *supra).* Even though reasonable men might disagree with that evaluation of this mother's actions, our court is bound by it, as I shall hereinafter demonstrate. In my opinion, the total deprivation of appellant's rights as a parent by the majority's determination is an unfortunate and unnecessary climax to this young mother's wanderings over the

past 12 years through a judicial maze and against formidable bureaucratic opposition. The majority's approach is new and extraordinary because heretofore, both before and after *Bennett,* a natural parent's rights could only be extinguished after a factual finding by the Family Court (and an appellate affirmance of such a finding, if an appeal is prosecuted) that the natural parent was either unfit, or had surrendered, abandoned or permanently neglected the child as defined by section 611 of the Family Court Act. Common to each of these findings is the element of fault. The majority, in its determination today, employs a newly invented concept called *"de facto* permanent neglect"—a no-fault approach to the termination of parental rights and obligations. In my view, this is not sanctioned by *Bennett.* I turn first to a review of *Bennett,* then to the sequel to *Bennett, Matter of Bennett v Marrow* (59 AD2d 492) and lastly to *Matter of Sanjivini K.* to amplify the basis for my disagreement with my colleagues in the majority. In *Matter of Bennett v Jeffreys* (40 NY2d 543, *supra),* a natural mother sought custody of her eight-year-old daughter from her custodian, a former classmate of the child's grandmother, to whom the child had been entrusted just after birth. No private agency was involved in the case. Although the quality and quantity of the mother's contacts with the child over the eight-year period were disputed, both the Family Court and this court held that there had been no abandonment by the mother or any showing of unfitness. In consonance with the foregoing, this court reversed a decision of the Family Court and ordered the return of the child to her natural mother, relying on the principle that "in a contest between a parent and a nonparent for the custody of an infant, the parent enjoys the paramount right to raise the child, and will not be deprived of that right absent a showing of unfitness or abandonment" *(Matter of Bennett v Jeffreys,* 51 AD2d 544). After framing the issue as to whether a natural mother, who had not surrendered, abandoned, or persistently neglected her child, could be deprived of custody because of prolonged separation from the child for most of its life, the Court of Appeals held that prolonged separation itself constituted an extraordinary circumstance which mandated that disposition of the custody issue be determined by the best interests of the child and not, as this court had held, by any presumption in favor of the natural parent. The Court of Appeals, in *Bennett* (40 NY2d 543, 551, *supra),* criticized this court because, "in awarding custody to the mother [the Appellate Division], too automatically applied the primary principle that a parent is entitled to the custody of the child", which was "not enough" when extraordinary circumstances are present. Furthermore, "no psychological or other background examination of the mother had ever been obtained" and "no consideration" was given as to "whether the mother is an adequate parent, in capacity, motivation, and efficacious planning." Although it noted that the Family Court had relied on the "seven-year period of custody by the nonparent" and "the related testimony of a psychologist", the Court of Appeals also refused to accept the Family Court's finding because it did not "adequately examine into the nonparent custodian's qualifications and background", and the fact that in the absence of the mother's consent to an adoption, the child would have to remain "in legal limbo" for certain purposes. Therefore, rather than dispose of the matter on the record before it, the Court of Appeals remanded the issues to the Family Court stating that "a new hearing is required because the Family Court did not examine enough into the qualifications and background of the long-time custodian, and the Appellate Division did not require further examination into the qualifications and background of the mother." In remanding the proceeding for a

determination as to the best interests of the child, the Court of Appeals also provided certain guidelines for the Family Court to consider in determining those issues (*Matter of Bennett v Jeffreys, supra,* pp 551-552). It is significant to note here that the Court of Appeals explicitly held (*supra,* p 548) that "Extraordinary circumstances alone do not justify depriving a natural parent of the custody of a child." Thus, according to the Court of Appeals, the presence of "extraordinary circumstances" arising out of the "seven-year period of custody by the nonparent" in *Bennett* did not lead, as a matter of law (as the majority holds here) to a final determination of the child's status and an immediate award of custody to the nonparent. Rather, these circumstances merely triggered the need for a *Bennett*-type hearing to determine the best interests of the child, as reflected by the Court of Appeals remand of that issue to the Family Court. The sequel to this record may be found in *Matter of Bennett v Marrow* (59 AD2d 492, 494, *supra),* wherein Mr. Justice O'Connor described the extent and quality of the hearing conducted as one which "extended over a four-week period" and involved "the testimony of some 26 witnesses" and an "in-depth examination of the psychiatrists, psychologists, social workers, teachers and other witnesses called by [both] parties." On the basis of the new hearing, and with the benefit of the additional evidence that the child had been in the home of the mother for 15 months and had not settled into the household, custody was granted to the nonparent. Also of significance, however, is that the child in *Bennett* was not adjudicated to be permanently neglected, so that the mother therein retained her right to veto an adoption and was, in fact, granted visitation with the child. I turn now to a review of the Court of Appeals decision in *Matter of Sanjivini K.* (40 NY2d 1025, *supra),* the other case which the majority cites for the result herein, and which involves *the same child and the same parties.* (Since most of the facts and procedural background of this litigation have been detailed in this court's findings of fact in *Matter of Sanjivini K.* [53 AD2d 863, *supra],* there is no need to repeat them now.) The earlier appeal involved a foster care review proceeding, which was commenced in the fall of 1974 by the Department of Social Services pursuant to section 392 of the Social Services Law. At the time, the child was eight years of age and had been in foster care for that entire period. The Family Court concluded in that case that foster care should be continued because of a "six-month gap in visitation" and because the natural mother placed her interests before those of the child, was unstable, made unjust accusations and was seeking to use the child as a means of remaining in this country. By its order dated February 14, 1975, the Family Court not only continued the foster care status of the child, but also (1) directed the Commissioner of the Department of Social Services to institute a proceeding to free this child for adoption within three months of its decision, and, if he failed to do so, gave that right to the foster parents, and (2) directed the return of the child to its natural mother if such a proceeding had not been commenced with the mandated three months. On appeal to this court, we made comprehensive and detailed findings of fact (including those recited earlier) and, by an order dated July 6, 1976, reversed the order of the Family Court and directed the return of the child to her natural mother. The appeal from our order was argued before the Court of Appeals during November, 1976, just two months after that court decided *Bennett,* and was decided in December, 1976. The Court of Appeals reversed our transfer of custody to the natural mother and reinstated the Family Court order. However, without finally determining the issues, the Court of Appeals concluded (*Matter of Sanjivini K.,* 40 NY2d 1025, 1026, *supra):* "The inter-

ests of the child, her natural mother and her foster parents will best be served by resolving the status of the child and the rights and obligations of the parties in [the] permanent neglect proceeding [which had been commenced 12 days after the foster care order, had resulted in a finding of permanent neglect and was then on appeal to this court] in conformity with the standards we have enunciated *(Matter of Bennett v Jeffreys,* 40 NY2d 543)." The Court of Appeals (p 1026) explained that "Because of the restricted focus of the foster care review proceeding, the limitation of findings by Family Court to those appropriate to the review of the foster care status of the child, and the insufficiency of the record in general, the present foster care review proceeding is not the appropriate judicial vehicle in which to determine the permanent status of the child." However, in leaving these issues for resolution in the permanent neglect proceeding, the Court of Appeals clearly and unambiguously disavowed any predetermination on its part, and disclaimed any veiled directive to this court, stating (p 1026): "Accordingly, *we do not now reach or express any view with respect to the issues which will ultimately be resolved in the permanent neglect proceeding,* and our reversal of the disposition at the Appellate Division in the present proceeding should in no way be taken as indicating whether the child should remain with her foster parents or be returned to her mother." At no time did the Court of Appeals question, challenge, vacate or criticize this court's findings of fact on the earlier appeal in reaching the result which it did. The reversal clearly was *not* predicated upon any disagreement with those findings. I therefore submit that this court's findings of fact remain undisturbed, are still in full force and effect and are binding upon us on this appeal (even though the makeup of the present Bench is different). The same background, the same facts and practically the same record are involved. Quite apart from the foregoing, it is my further opinion that no matter how one reads the decisions in *Bennett* and *Sanjivini K.,* there is no basis therein to support the concept of *de facto* permanent neglect—the new principle of law upon which the majority relies. Nor is there discernible in *Sanjivini K.* any clear or veiled suggestion that this court can make original findings of fact as to the best interests of this child without a *Bennett*-type hearing, especially on the basis of a record which (1) is at once as insufficient as the record which the Court of Appeals deemed inadequate in *Matter of Sanjivini K.,* (2) was prosecuted to a conclusion months before the *Bennett* standards were enunciated and (3) is even more devoid of expert psychiatric, medical, psychological and educational testimony than was the original record involved in *Bennett.* If, as the majority holds, extraordinary circumstances created by the long-term placement of a child with nonparents can be equated with *de facto* permanent neglect and permit the result reached here, one can only wonder why the Court of Appeals rejected the opportunity to enunciate such a principle in *Bennett* where, as here, there was a substantial period of nonparental custody, or in *Sanjivini K.,* where the period of placement was at least 10 years. I submit there is no statutory or decisional support for the majority's conclusion on this issue and that the majority's refusal to accept the following logical and pragmatic explanation for the Court of Appeals statement that the status of the child and the rights of the respective parties should be resolved in this permanent neglect proceeding is inexplicable. The explanation for the Court of Appeals preference for a resolution of these crucial issues in the permanent neglect proceeding (rather than in the foster care review proceeding) may be found in (1) the different consequences which flow from findings of "permanent neglect" vis-à-vis a proceeding dealing with custody issues and (2) the

concern expressed by the court in *Bennett* (40 NY2d 543, 551, *supra)* that "absent a finding of abandonment or neglect by the mother, or her consent, the nonparent cannot adopt the child" and the child will therefore be left in "legal limbo, her status indefinite until the attainment of her majority." The court, in elaborating upon its concern, continued: "For a single example, a question could arise as to whose consent, the parent's or the nonparent custodian's, would be necessary for the child to marry while underage (see Domestic Relations Law, § 15, subd 2 [consent of 'parent' or 'guardian' required])." Similar questions could arise with respect to the child's employment, its entry into certain occupations, adoption, and any other matters requiring the consent of a parent or legal guardian "(e.g., General Obligations Law, § 3-105, subd 2, par c; Education Law, § 3230, subd 3, par b; Domestic Relations Law, § 111, subds 2-3)." Here, the remand of the issues in *Sanjivini K.* for a *Bennett*-type hearing in the context of the foster care proceeding would have left this child in "legal limbo". However, in the context of the permanent neglect proceeding, where neglect had already been adjudged, an affirmance by this court would have resolved the dilemma, since the mother's consent would no longer be required and the legal status of the child would be permanently resolved. Moreover, an affirmance would have rendered a *Bennett*-type hearing unnecessary except, possibly, as part of the dispositional hearing. In anticipation of a possible reversal of that permanent neglect finding, however, and in order to preclude the likelihood that, upon dismissal of the permanent neglect proceeding, the issues as to the best interests of the child would remain unresolved, the Court of Appeals in *Sanjivini K.* was directing that those issues be resolved à la *Bennett.* Thus, in order to achieve a *Bennett*-type disposition in the event that the finding of permanent neglect was reversed, the Court of Appeals was prompted to remark (40 NY2d 1025, 1026-1027, *supra)* that "in the circumstances disclosed in the record now before us [we] urge that all proceedings concerning the child be conducted to their final conclusions with dispatch, in the best interests of the child. To accomplish that result both the Family Court, because of its wide original jurisdiction, and the Appellate Division, given its broad power of review over facts and its equally extensive power to exercise discretion, may choose to initiate, consolidate, or review all proceedings heretofore initiated and any which may hereafter be brought." Not only is there no authority in that language to bypass a *Bennett*-type hearing, but the mandate is clear that one must be held *if the permanent neglect route does not succeed.* Reliance on the Court of Appeals decisions in *Bennett* and *Sanjivini K.* thus does not provide an exemption from a *Bennett*-type hearing. Rather, they mandate one. Otherwise, the reference to the original jurisdiction of the Family Court and to proceedings "which may hereafter be brought" would be superfluous and totally unnecessary. Quite apart from this consideration, and assuming a basis for a *"de facto* permanent neglect" concept, the application of such a concept in the factual and procedural posture of this litigation is most inappropriate and achieves an unjust result which cannot be justified even by the "best interests of the child" rationale. The record of all the prior proceedings and appeals herein indisputably establishes that the initial placement of this child with the Department of Social Services was intended to be temporary because of the distressed circumstances in which the natural mother found herself prior to and immediately following the child's birth. It further establishes that the prolonged separation giving rise to the extraordinary circumstances which the majority equates with *"de facto* permanent neglect" was involuntarily imposed upon the mother by (1) the

neglect proceeding commenced by the Department of Social Services in 1967 (which, as stated by this court, was "obviously designed to forestall the deportation, to gain time and to induce the Immigration Service to permit Usha and her baby to be reunited" *[Matter of Sanjivini K., 53 AD2d 863, 865, supra]),* (2) the evident resistance of the Department of Social Services to this young mother's efforts to be reunited with her child, as reflected in the department's refusal to provide her with the assistance she had been led to believe would be forthcoming so that she could establish herself financially and become reunited with her child upon the completion of her master's degree in nutrition and (3) the more than five years which have been consumed in judicial proceedings to which this young mother has been subjected since April, 1973: (a) the permanent neglect proceeding commenced in April, 1973, in which the Family Court concluded, on January 29, 1974, that there was no basis for a finding of permanent neglect against her; (b) her petition for custody dated February 7, 1974 which was denied almost five months later, on July 3, 1974; (c) her appeal from that order which, after four separate attorneys were assigned by this court to perfect and prosecute, was dismissed some 18 months later, on December 4, 1975, for failure to perfect the appeal; (d) the foster care review proceeding commenced in the fall of 1974, which was decided by Family Court on February 14, 1975, by this court on July 6, 1976 and by the Court of Appeals in December, 1976; and (e) the permanent neglect proceeding commenced on February 28, 1975, which was decided by the Family Court on May 28, 1976, and finally by this court some 25 months later. Inasmuch as this parent has been exonerated by a final and conclusive order of the Family Court, dated January 29, 1974, of any permanent neglect during the eight years prior thereto, and since the four years subsequent thereto have been consumed in litigation, this parent cannot, and should not in fairness and justice, have all of her rights as a parent extinguished either on the basis of *de jure* neglect as defined by section 611 of the Family Court Act (the majority has rejected such a conclusion) or *de facto* neglect, which the majority has created to accomplish this result. Except for the failure of one of the four attorneys assigned by this court to perfect the parent's appeal from the denial of her custody petition in June, 1974, it is likely (on the basis of this court's decision in *Matter of Sanjivini K.),* that we then would have awarded custody of the child to her. Assuming, *arguendo,* that the appeal from the order had been prosecuted, and that the extraordinary circumstances present herein would have prompted the Court of Appeals to make that appeal the basis for enunciating the *Bennett* standards, it is reasonable to conclude, in view of the result reached in *Bennett,* that this natural parent would not have lost her rights of visitation, etc., as she does as a direct consequence of the decision herein. Finally, the result reached here cannot be predicated on any mental infirmity of the natural mother. Except for a hearsay statement in 1967 or 1968 by a psychiatrist appointed by the Family Court that the mother was paranoid, the Department of Social Services has offered no competent psychiatric or psychological testimony as to the mother's mental condition. In the face of the unequivocal refutation of this suggestion by Dr. Wickstrom, who, in 1974, found no mental condition which would disqualify this mother from caring for her child, the record at bar is barren of any basis for disqualifying her as a competent mother because of any mental condition. Similarly, the record is barren of any adequate examination into the qualifications and background of the foster parents, who are both in their early sixties. I submit that the result herein has been reached on the basis of a record which establishes, at best, that the child has been Ameri-

canized, likes American food, understandably prefers her foster parents, is embarrassed by her mother's attire and personal habits and has resisted visiting her mother in New York City because of brainwashing and the unfavorable impressions gleaned from her televised view of the city. By its affirmance of the Family Court orders, the majority today determines the status of the child and the rights and obligations of the respective parties, and does so on the basis of a record which, as I have previously discussed, does not measure up to the quality contemplated by the Court of Appeals in *Bennett* and *Sanjivini K.* and is totally devoid of any articulation as to the best interests of this child. This weakness in the majority's determination is compounded, I believe, by the absence in this record of any such findings over the past 12 years and of any expert testimony to support this conclusion. The supervisor of the Children's Services Division of the Rockland County Department of Social Services testified at the foster care review proceeding that "It has been the Department's feeling since the child came into care and subsequent, each subsequent year upon her being in care, that the best plan for her would be to remain in the foster care." However, when asked by the court whether "there [is] anything of your own knowledge that you can testify to as to why it would be in the best interest of this child that the child remain in the present foster home?", this hostile and adverse witness most surprisingly and unequivocally answered with a firm, "No, Your Honor." It is somewhat startling that neither this nor any other representative or expert produced by an agency which has harbored and actively pursued this feeling for at least eight years could be unprepared to articulate how the best interests of the child would be served by achieving its objective. It is also remarkable and of great significance that the very same order which directed institution of this neglect proceeding, to wit, the Family Court order of February 14, 1975, also ordered that custody of the child be returned to the natural mother if a proceeding to free the child for adoption had not been commenced within three months. The Court of Appeals, in reversing the order of this court in *Matter of Sanjivini K.,* reinstated the order of the Family Court. Any order of the Family Court, approved by the Court of Appeals, which contemplates or suggests return of this child to the natural mother, must cast some reasonable doubt upon a determination which now concludes that this child's best interests are served solely by the award of custody to the foster parents and the extinction of all contact between the child and her parent. While I agree that the best interests of this child must be served, I do not agree that they are best served by the result reached here by the majority's imposition of its collective value judgment. Concededly, the child is not now prepared or willing to be reunited permanently with her mother. However, no consideration has been given to an extended, well-planned and supervised visitation plan to prepare the mother and child for a possible reunion in the future. It must be noted that the award of custody to the nonparent in *Bennett* was made after the mother had had 15 months in which to establish a relationship with her daughter. Here, this mother has been denied any such opportunity and has repeatedly been frustrated in her attempts to promote overnight or weekend visitations with her child. In a case where a child in foster care does not know its parents, it is understandable that the anonymity of the parents should be continued, as contact between the parents and the child can be damaging as well as disruptive. Such is not the case here. The child knows her mother and has had contact with her for all of her 12 years. Except for her constant struggle against the Department of Social Services and the foster parents, this mother could conceivably have become

more Americanized than she has. On the other hand, the child's feeling of embarrassment because of her mother's attire, personal habits and adherence to her native customs, somewhat confirms the natural parent's claim that the child has been brainwashed against her and reflects, damagingly, in my opinion, on the environment in which she has been reared, i.e., one which would permit and encourage such a marked attitude towards her mother. There has been no explanation or inquiry herein as to how the best interests of this child will be served by an award of custody to the foster parents, who are, concededly, in their early sixties, are strangers to the culture and traditions of this child's ancestors, and who, in all likelihood, because of their age, would not be eligible to adopt any other child. In view of the case histories of adopted children who have exerted great efforts to trace their roots and reach their parents, the psychological trauma which may be inflicted upon this child in the future may be substantially more damaging than the trauma feared by the majority. The result herein risks subjecting this child to a lifetime of immeasurable psychological damage should she hereafter come to realize that her stated preference for her foster parents and her embarrassment with her mother were in some measure responsible for the shabby treatment given to her mother both by the Department of Social Services and the courts, and perhaps even for her mother's deportation to India, which is not unlikely in view of the decision in this case. The need for an end to the uncertainty of this child's status could just as readily be accomplished without an adoption, by an award of permanent custody to the foster parents with visitation rights to the mother. Such a result would not only preserve the contact between the child, the mother and the foster parents, but would provide an opportunity for an expanded relationship between the mother and the child in the event of a change in attitude on the part of the latter in later years. Even if no change should occur, however, the risk of subjecting the child to the psychological trauma which could foreseeably occur upon her realization of what has transpired here will at least be avoided. An award of permanent custody to the foster parents without a formal adoption would not preclude the vesting in them of authority to make decisions concerning the child's marriage, if she is underage, or situations "affecting employment and entry into occupations" and "other matters requiring the consent of a parent or legal guardian" (as referred to in *Matter of Bennett,* 40 NY2d 543, 551, *supra),* as long as there is some advisory input by the mother. The fear that the natural parent would remove the child to India is unrealistic and can be prevented simply by appropriate directions to the Immigration Service. However well intentioned and sincere the foster parents may be, they are nonetheless strangers to the culture and traditions of this child's ancestors. It may be important to preserve this contact for the child, who in her adolescence and future life may be motivated to trace her roots, despite her present childhood resistance to her mother's traditions. Also, by permitting the child contact with her natural mother, the mother's deportation conceivably might be avoided and the opportunity for this child to establish a healthy and wholesome relationship with her mother in her own time and on her own terms will be preserved. In this regard, notice must be taken of a recently published study of 624 foster children, contained in Children in Foster Care, by Professors of Social Work David Fanshel of Columbia University and Eugene Shinn of Manhattan's Hunter College, which concludes that "It is better for the child to have to cope with *real* parents who are obviously flawed * * * than to reckon with fantasy parents who play an undermining role on the deeper level of the child's subconscious." As these

researchers point out, "though loving foster parents may seem to make up for the missing biological kin * * * 'on a deeper level, the abandonment by natural parents can impose a profound sense of loss, and the child's ease with himself can be markedly impaired.' " These authors further warn that a "cavalier readiness" to drum natural parents out of a youngster's life is both unfair to them and dangerous to the child *(Time,* April 10, 1978, p 88). For all of these reasons, a determination as to the best interests of this child and a final disposition as to her status must await a *Bennett*-type hearing in order to comply with the reasoning of the Court of Appeals in *Bennett* and *Sanjivini K.* I, therefore, dissent and vote to (1) reverse the orders appealed from, (2) convert the permanent neglect proceeding to one to determine the best interests of the child pursuant to *Matter of Sanjivini K.* (40 NY2d 1025, *supra)* and *Matter of Bennett v Jeffreys* (40 NY2d 543, *supra)* and (3) remand the proceeding to the Family Court for a full hearing and withhold a final determination as to the status of the child and the respective rights and obligations of the natural mother and foster parents pending the determination to be made after the new hearing. In the meantime, visitation between the child and the natural mother should be continued if it has not heretofore been discontinued, or resumed if it has been discontinued. I am mindful that such a hearing may further delay the resolution of this litigation. In the face of the four-year delay associated with the proceedings since January, 1974, and most particularly the 20-month period of delay between May, 1976 and the date that this case appeared on our calendar, the delay associated with such a hearing pales into insignificance and cannot form a plausible or valid excuse for not complying, even at this late date, with *Bennett* and *Sanjivini K.* By this court's implementation of monitoring procedures with respect to the completion of any such hearing, and by the expeditious processing of any resultant appeal to a speedy conclusion, further undue and untoward delay can be avoided.