*860 OPINION OF THE COURT
Kathryn McDonald, J.
This hearing, in which the question of Jonathan D.’s immediate custody is to be decided, was ordered by the Appellate Division following a long series of court proceedings. Jonathan D., born on June 12, 1968, was voluntarily placed with Jewish Child Care Agency (hereafter Agency) by his mother in June, 1971.[1] The most recent foster care review hearing extending placement was commenced in October, 1976 and concluded on February 1, 1977, with foster care and visitation continued indefinitely. In December, 1976, while the foster care review was still pending, the Agency initiated its petition under section 384 of the Social Services Law and article 6 of the Family Court Act to terminate Mrs. D.’s parental rights. The petition was dismissed by the Family Court (Kram, J.) in June, 1977, and Jonathan was ordered returned to his mother at the end of the 1978 school year. That decision was appealed by the Agency, which argued that such a disposition was beyond the statutory power of the Family Court hearing a termination petition. In April, 1978 the Appellate Division (First Department) sustained the dismissal, but modified the order and remitted the case "for a dispositional hearing on the issue of the best interest of the child.” Those hearings were held during the summer of 1978 before this court, and final posttrial memoranda were submitted by all attorneys by early November.
To summarize: the child involved was placed with his foster parents when he was three years old. Department of Social Services (DSS) and Agency case files show that four and one-half years later the natural mother told the Agency she wanted the child returned to her in six months, that is, five years after he was placed. At the specified time, however, the mother stated she was unable to take the child due to a temporary housing problem. Six months later (five and one-half years after the initial placement) the Agency commenced its termination proceeding. That matter, and its subsequent appeal and remand, took nearly 18 months. The child is now 10 years old. He has lived with his foster parents for the last seven years.
*861 Having briefly presented the complicated factual history of this case, the court wishes to emphasize the troublesome legal issues. First is the question of the nature and scope of the hearing ordered by the Appellate Division. The resolution of that first question leads to the second: the applicability of Matter of Bennett v Jeffreys (40 NY2d 543) to statutory cases involving professional child care agencies, in which not only custody, but termination of parental rights, may be at stake.
The first problem arises out of the brevity of the Appellate Division’s decision, which affirmed Judge Kram’s dismissal of the permanent neglect petition at the fact-finding stage of the proceeding. That dismissal was based on the Agency’s failure in its obligation to use "due diligence” to maintain and strengthen the bond between mother and child while the child was in foster care. The Agency’s failure made a finding of permanent neglect impossible as a matter of law and fact. (Family Ct Act, § 614.) Normally a case dismissed at the fact-finding stage would not continue to a dispositional hearing, there being no "case” to "dispose.” (Matter of Joyce Ann R., 82 Misc 2d 730.) However, the Appellate Division stated, "in light of the fact that Jonathan has been in the custody of foster parents for a prolonged period of time, there should have been inquiry into and a determination of the best interest of the child prior to a direction that he be returned to the natural mother. (See Matter of Bennett v Jeffreys, 40 NY2d 543, 550.)” (Matter of Jonathan D., 62 AD2d 947, 948.) Similar remand orders after the dismissal of a petition at the fact-finding stage have been made by the Appellate Division in the Second Department (Matter of Abbott House v Barbara, 55 AD2d 604; Matter of Jean Yvette E., 59 AD2d 907). Bennett required the court in a custody proceeding governed by common-law principles to inquire as to the child’s best interest when "extraordinary circumstances” (similar to the grounds specified in the Family Court Act and Social Services Law) were established. This court has therefore interpreted the Appellate Division’s order to mean that, despite the absence of a finding of fact based on the applicable statutes, temporary custody may be awarded strictly according to the child’s best interest, without advantage or presumption in favor of the natural mother.
Only two things, then, were established by the initial Family Court decision: the mother’s continued parental status and the Agency’s failure of due diligence. In effect, the mother was *862 declared fit and the Agency derelict. But left unanswered was the question of how the child’s life was to be affected by the adults’ legal disputes. This court is charged with deciding that question based solely on Jonathan’s best interest. It will do so, despite its serious reservations as to the effect on other children and families should Bennett be extended past its original boundaries to situations in which professional child care agencies have had statutory responsibility for supervising foster care placements.
In examining the question of Bennett’s applicability to cases such as the one before it, the court has looked, first, to the Court of Appeals decision itself, and, second, to subsequent interpretations of Bennett by the same court and others. Bennett itself stated, "At the outset, it is emphasized that not involved is an attempted revocation of a voluntary surrender * * * for adoption [citations omitted]. * * * Nor is there involved the temporary placement into foster care by an authorized agency” (Bennett, supra, p 545). The court concluded, "Thus, as an unsupervised private placement, no statute is directly applicable, and the analysis must proceed from common-law principles.” (Bennett, supra, p 545.) The legal and factual distinctions between private foster care arrangements such as that in Bennett and those undertaken by State-regulated professional agencies are significant. It is likely that the parent placing a child with a professional agency does so in reliance upon certain implicit or explict assurances: that the agency is a competent and experienced custodian, that it will offer services to aid the family in addition to custodial care alone, and that it will return the child according to the surrender agreement. The State’s licensing of the agency, and the Family Court’s role in approving such voluntary placements (Social Services Law, § 358-a) add the State’s authority to the agency’s, in contrast to the informal private arrangement. Another distinctive factor is the powerful role assumed by the agency in its dealing with the parent. Unlike a private, nonprofessional foster-parent, the child care agency can muster its prestige, expertise, professional staff, and administrative structure to aid, or hinder, the natural parent. (Matter of Joyce Ann R., supra.) Finally, in recognition of the importance of the Agency’s powerful role in foster care, the Legislature has repeatedly examined the administration, funding and statutory structure of foster care agencies (Temporary State Comm on Child Welfare, Children *863 of the State, vols 1, 2, 1975, 1976) and has enacted comprehensive legislation designed to regulate agency practices so as to assure prompt reunification of families whenever possible, or to provide alternate permanent plans when reunion is impossible. (Social Services Law, § 384-b.) These and other distinctive features of agency foster care[2] mean that extension of private custody rulings such as Bennett to agency situations is hardly automatic.
Despite these differences, some courts, including the Appellate Division, Second Department, have been willing to apply Bennett’s "best interest” rule to agency cases involving custody disputes, and even termination of parental rights cases. (Matter of Abbott House v Barbara, 55 AD2d 604, supra; Matter of Kim Marie J., 59 AD2d 716, mot for lv to app den 43 NY2d 826; Matter of Jean Yvette R, 59 AD2d 907, supra.) Once again, this court must note its genuine concern with the brevity of these decisions, which are written in brief memorandum form. The court has been unable to find any appellate decision that has noted, let alone explored, the differences between private and agency foster care placement. Nor has the issue of extending Bennett from simple custody disputes to termination of rights proceedings been clearly addressed by an appellate court.[3] These questions were discussed in a brave and thoughful decision by Family Court Judge Stanley Gartenstein (Matter of Suzanne Y, 92 Misc 2d 652, 658, app pending) who concluded that "no-fault” termination of parental rights without statutory grounds "has been ever present albeit inchoate from the moment the Court of Appeals enunciated its historic decision in Matter of Bennett v Jeffreys”. Judge Gartenstein candidly noted that "the statutory scheme has been made virtually irrelevant in reliance on Bennett v Jeffreys” (Matter of Suzanne Y, supra, p 660), and expressed uncertainty as to the Court of Appeals’ ultimate intention: "We have no way of telling unless and until the Court of Appeals has an opportunity — and one would guess this will be forthcoming with rapidity — to clarify its ruling * * * and delineate precisely what its application will ultimtely be.” *864 (Matter of Suzanne Y., supra, pp 659-660.) Judge Gartenstein resolved his doubts as to Bennett's applicability to proceedings brought by agencies seeking termination of parental rights according to his interpretation of Matter of Sanjivini K. (40 NY2d 1025, on second appellate review 63 AD2d 1021). Other courts (Matter of Andress, 93 Misc 2d 399) have also considered Sanjivini conclusive as to the Court of Appeals’ intention to extend Bennett to agency custody and termination cases, but this court must raise several serious questions.
Sanjivini K. was decided by the Court of Appeals in December, 1976, three months after the historic Bennett decision was filed. In 1966 the natural mother voluntarily placed her child in agency foster care two weeks after giving birth, with the express intention of regaining custody when she had completed her studies and become self-supporting. The child remained in foster care for 10 years. In 1976 a Family Court foster care review proceeding directed the institution of a permanent neglect proceeding so as to allow the child’s permanent status to be ascertained "as soon as possible”. (Matter of Sanjivini K., 40 NY2d 1025, 1026, supra.) The Appellate Division, Second Department, reversed in July, 1976, finding that "the best interests of the child” (the legal standard in a foster care review proceeding; Social Services Law, § 392) required returning the child to the mother, who had never been proved "unfit”. (53 AD2d 863.) That decision was in turn appealed, and in December, 1976 the Court of Appeals review the Appellate Division’s reversal of the foster care review proceeding. That initial proceeding, it must be emphasized, was one in which only temporary custody could be awarded or denied; it could not, as noted by the Court of Appeals, decide the child’s permanent status or the parent’s ultimte rights. Although the only question formally before the Court of Appeals was the foster care review appeal, the court noted that the permanent neglect proceeding originally ordered by the Family Court had been duly commenced, had resulted in a finding of permanent neglect, and was itself on appeal. The Court of Appeals then stated that all the parties’ interests should be resolved in that appeal "in conformity with standards we have enunciated (Matter of Bennett v Jeffreys, 40 NY2d 543).” (Matter of Sanjivini K., supra, p 1026.) That dictum is, as Judge Gartenstein pointed out in Suzanne Y., "our only guidance” as to Bennett's applicability to agency cases and termination of rights cases. This court, however, *865 must respectfully differ, for reason set out below, with his conclusion that Sanjivini supports or requires "no-fault” termination of rights.
First, it is clear that the only question on appeal was the correctness of the foster care review decision. It was not necessary for the court to address the special issues of a permanent neglect or termination of rights proceeding in what was essentially a custody review. Nor is it indicated in the brief memorandum opinion filed by the court, whether those issues were presented by the parties’ counsel. The statement regarding the permanent neglect proceeding is clearly dictum, possibly persuasive, but not compelling.
Nor was there any indication in the memorandum opinion that the practical relevance and distinctions of agency involvement, in contrast to Bennett’s private placement, had been considered. As noted earlier, several distinctions come readily to mind, yet there is no hint that these had been analyzed by the court.
This court finds itself uncertain as to the Court of Appeals’ ultimate intention regarding Bennett’s application. For all its breadth and philosophical import, Bennett remains a decision explicitly based on common-law principles. The Court of Appeals is without doubt the best source of New York State’s common law, and its presentation in Bennett is conclusive. But Sanjivini and the cases that followed presented factual situations in which statutes controlled. Had the Court of Appeals actually intended in Sanjivini to nullify the elaborate statutory scheme devised by succeeding Legislatures to govern foster care, surely it would have made its intention known in a full, signed opinion based on a record, briefs, and argument presenting the relevant issues. Sanjivini is once again before the Court of Appeals, on appeal from the Appellate Division’s affirmance of the permanent neglect finding made by the Family Court in June, 1978 (63 AD2d 1021, supra). It is the prayer of this court that a clarifying decision will be rendered. In the interim the court feels itself constrained to limit carefully its application of Bennett principles in any case involving agency foster care and/or termination of parental rights.
The practical problems are not difficult to imagine. If an agency fails, over the course of several years, to use the required "due diligence” to strengthen the family unit, its petition to terminate parental rights must be denied, as was *866 done here. However, once the passage of time is deemed an "extraordinary circumstance” and a best interests hearing is held, it is predictable, if not inevitable, that the attachment formed between the child and foster parents will defeat the natural parent’s hope for reunion. Thus a natural parent may not rely on the agency’s best efforts. (As noted by Judge Kram in her original decision of this case the result of . such practice could very well be a reluctance or refusal by many parents to place their children voluntarily, despite their need for such help.) In the past, such parents relied on the law’s assurance (Social Services Law, § 384-a, subd 2, par [c], cl [ii]; § 384-b, subd 7, par [a]; Family Ct Act, § 614, subd 1, par [c]) that the agency must use its due diligence to reunite the family as quickly as possible, so that the voluntary placement will be temporary. Under a new policy applying Bennett to termination proceedings, it would seem that the Legislature’s efforts under sections 384 et seq. and 392 of the Social Services Law to promptly reunite families will be defeated. After sufficient time has elapsed, the child will be kept with the foster parents regardless of the parent’s fitness or the agency’s failure. The ultimate effect "would be to ratify inaction or unilateral decisions by child caring agencies and to legitimize relationships caused by the unresponsiveness and unconscionable delays in court proceedings.” (Juvenile Rights Division Newsletter, vol 4, No. 2, February-March 1978, The Legal Aid Society, Brooklyn, New York, p 10.) Ironically, the only disposition legally available to the child is continued foster care, under the supervision of the very agency whose past failure to him and his natural parents made permanent planning — either return to the natural family or adoption by the foster family — impossible.
This is not a "small” problem. Of 28,000 children in foster care in New York City alone, approximately 75% were placed voluntarily by their parents, in reliance on the foster care agency’s statutory and contractual obligations. And, sadly, it is not a hypothetical concern. Even with the best of intentions, the complex foster care system, comprised of State regulatory boards, local Department of Social Services offices and myriad private contracting agencies (roughly 80 in New York City) has been shown to fail thousands of children and families.[4] This court cannot devise a satisfactory result, for to *867 serve the best interests of one child in one case may be to set dangerous precedents for other children in future cases; but to sacrifice one child for the sake of protecting others, in effect, to hold a child like Jonathan D. hostage in order to guarantee satisfactory performance by agencies, is unthinkable. This court, under the direction by the Appellate Division, can only do its best to make findings as to the best interest of this 10-year-old child and urge the State’s highest court to rule on the extent of the applicability of Bennett to other cases involving agencies and termination of parental rights.
Jonathan’s interests are primarily a question of present and future circumstances, so the court will not dwell on past events. The natural mother’s background and qualifications were established at both Family Court hearings, at which she testified at length. The placement of her children was a voluntary act, undertaken at a time of great personal stress following her divorce, and reflected her best judgment as the children’s and her own needs at that time. There has never been a charge, much less a finding, of neglect, although Mrs. D. and the Agency were aware of her psychiatric problems— depression and schizophrenic symptoms — that recurred at intervals during the early years of Jonathan’s placement. (Mrs. D. had undergone psychiatric therapy in the past but is not currently receiving or seeking such help.) Mrs. D. appears to be of normal intelligence. After leaving high school in the ninth grade and taking a business course, she worked as a secretary until her marriage in 1960. Since then she has worked only sporadically as a waitress/cashier. Mrs. D.’s two older sons, now ages 17 and 15, had also been voluntarily placed in foster care at roughly the same time as Jonathan. Both boys have been returned to her care and custody by the Agency, and there is no reason to believe she is not caring for them adequately.
The foster parents with whom Jonathan has lived for the last seven years are a couple with five children of their own, between the ages of 14 and 25. Mrs. S. is a registered nurse whose night-shift work allows her to be home when her two *868 children remaining in the home and Jonathan return from school. Mr. S. is an engineer. He suffers from diabetes, which is controlled by oral drugs. Neither foster parent has any history of emotional or mental illness or family discord.
As Bennett stated: "Extraordinary circumstances alone do not justify depriving a natural parent of the custody of a child. Instead, once extraordinary circumstances are found, the court must then make the disposition that is in the best interest of the child.” (Bennett, 40 NY2d 543, 548, supra.) The factors given greatest weight are Jonathan’s relationships with his natural and foster families, his development thus far, his own feelings and preferences, and the recommendations of the court’s expert witness (a Bureau of Mental Health Services [BMHS] psychiatrist) and the Law Guardian. Jonathan recited his contacts with his natural family throughout his seven years in foster care during an interview with the court in chambers. He knows his brothers, sometimes plays ball with one of them during visits, and is attached to them. It is also clear that Jonathan knows and loves his mother, and takes care not to hurt her feelings. He has also visited his grandmother and aunt. His attachment to his foster family, however, appears to the court, its psychiatric expert and the Law Guardian to be much stronger. Quite simply the foster parents are "mommy” and "daddy” to Jonathan; their house is "home”. It is clear that, after seven years, his foster parents are Jonathan’s "psychological parents” as that phrase has come to be understood. (Beyond the Best Interests of the Child, Goldstein, Freud, Solnit, New York Free Press, 1973.) The court’s interview in chambers simply confirmed the views of the Mental Health Services psychiatrist and Law Guardian, who found Jonathan’s primary attachment to be with his foster parents.
The foster home environment has benefited Jonathan, allowing and helping him to overcome earlier problems (e.g., hyperactivity) which threatened to hamper his social and academic progress. Jonathan now attends his appropriate grade (five) and is doing reasonably well.
This 10-year-old child is certainly aware of the nature of the current proceedings, and displays a sensitivity beyond his years when discussing his own feelings and preferences. Without indicating any hostility towards any member of his natural family Jonathan nonetheless makes it quite clear that he wishes to remain in his foster home. It seems plain to the *869 court that in fact he cannot imagine living away from the only home he has truly known. For example, he could not tell the court what name or title he uses for his natural mother: "I don’t call her anything.” Nor was he at all interested in his natural mother’s home, the local school, or neighborhood, or promised visits with his grandmother in Florida.
The BMHS psychiatrist interviewed the natural mother, both foster parents, and Jonathan. As to Mrs. D., Dr. Jerome Kessel concluded that she "could not fairly be described as schizophrenic at the present time,” in contrast to periods in 1972 and 1974 when schizophrenic and depressive symptoms were observed. The foster parents, according to the doctor, present no abnormal psychiatric histories or current symptoms, and "appear to be able to provide adequate parental guidance and support.” As for Jonathan, "difficulties, of course, will exist * * * if Jonathan is returned to his natural mother’s custody.” The psychiatrist warned that, "Given [Jonathan’s] history of past behavioral problems and his attachment to the foster parents, I feel that he may react very negatively if he is now returned to [his mother], and he will probably require psychiatric treatment if such a move is made.” The doctor therefore recommended that foster care continue, with weekend visitation with Jonathan’s natural family. The court believes that Jonathan is genuinely ambivalent in his feelings towards his natural family, and that his unease would be lessened if he were assured of permanent residence with his foster parents. However, lacking statutory grounds for termination of parental rights, or a clear direction from the Court of Appeals that such grounds are unnecessary in this case, the court cannot give Jonathan the permanency with his foster parents that he seems to need.
In closing, the court notes its awareness of the cases, many cited in respondent mother’s brief, deploring the separation of siblings (Obey v Degling, 37 NY2d 768; Matter of Ebert v Ebert, 38 NY2d 700). Those cases generally refer to private custodial disputes between parents, and speak of maintaining or reuniting a family group. Sadly, that is not the case here. Jonathan knows his two brothers, but the court has not seen evidence of any strong sibling attachment, and it has been seven years since the family group was intact. As stated earlier, Mrs. D.’s ability to provide a home for her two older sons does not mean that Jonathan’s best interests would be served by his return as well. Ultimately the purpose of the *870 best interests hearing is to serve the child’s rights and needs above all others.
The alternatives are limited. The court has explained its reluctance to extend Bennett to voluntary agency placements so as to allow complete termination of parental rights based merely on a showing of extraordinary circumstances. In addition to legal considerations, the facts in this case do not warrant termination of Jonathan’s ties to his natural family. The agency files, court testimony, and interview in chambers indicate that Jonathan’s feelings for his family are strong enough to produce an ambivalent response in this youngster: he clearly wants, and needs, to remain with his foster parents, yet he admits he might miss his natural family if he no longer saw them. A futher complication is his apparent fear of visits, based on his awareness that his status is uncertain. Weighing all of these factors, and based on the full record before it, the court concludes that continued foster care is the only feasible alternative, despite the instability, both as a matter of law and of daily living, inherent in that arrangement. Based on the testimony and record of the best interest hearing ordered by the Appellate Division, foster care is continued without prejudice to any subsequent review of foster care status brought pursuant to section 392 of the Social Services Law. The Agency is directed to continue foster care with the current foster parents and to continue visits with the natural family, in the hope that all parties will do their best to make Jonathan’s life as stable as possible.

. Mrs. D., who was divorced from Jonathan’s father in 1970, was given custody in the divorce decree. Mr. D. voluntarily relinquished his rights and consented to Jonathan’s adoption on February 4,1977.

. Constitutional issues arising out of the Agency’s role as a paid reimbursed "agent” of the State, acting to fulfill its parens patriae role, are always present, if not decisive. (See Wilder v Sugaman, 385 F Supp 1013.)

. Custody, although obviously the most meaningful right on a day-to-day basis, is not the only right a parent enjoys, and a parent who loses custody may, and usually will, continue to enjoy other rights including visitation, in contrast to the parent whose rights are judicially terminated.

. Failure being, in many cases, the simple inability to move children out of "temporary” foster care status either back to their natural families or to permanent *867 adoptive homes. See Bernstein, Snider, Meezan, Foster Care Needs and Alternatives to Placement: a Projection for 1975-1985, N. Y. S. Board of Social Welfare, Nov., 1975; Fanshell, Status Changes of Children in Foster Care: Final Results of the Columbia University Longitudinal Study, Child Welfare, March, 1976; Festinger, The New York Court Review of Children in Foster Care, Child Welfare, April, 1975; The Children Are Waiting: The Failure to Achieve Permanency, N. Y. C. Controller’s Audit, June, 1977.