In the Matter of MARK "GG",* a Child Alleged to be Neglected. CLINTON COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent, FRANCISKA J. "GG",* Appellant.

Third Department, July 26, 1979

---

* Fictitious names used for purposes of publication.

APPEARANCES OF COUNSEL

*Christine Marbach Kellett* for appellant.

*David B. Mahoney* for respondent.

*John A. Lahtinen* for intervenor adoptive parents.

**OPINION OF THE COURT**

HERLIHY, J.

The infant was born out of wedlock on January 5, 1975 in Montreal, Canada. About three weeks later, his mother, the appellant, brought him to Plattsburgh, New York, where she lived for a short time. Two or three days after her arrival in Plattsburgh, she placed her son with the Clinton County Department of Social Services. She lived at various places in the area and visited him weekly at the foster home where he had been placed.

On or about June 20, 1975, at her request, the infant was brought to her by a social worker with the intent that she would keep him at the home where she was then employed. Later that day the social worker was summoned to the home because the appellant was acting strangely, asserting that the baby food she had purchased had been contaminated, and that there was a force in the area affecting her and the infant and that she could hurt herself. The infant was returned to the foster home and the appellant was admitted to the Champlain Valley Hospital in Plattsburgh where she was diagnosed as suffering from schizophrenia. She was transferred to the St. Lawrence Psychiatric Center where she was treated first as an in-patient and later in a halfway house. She was discharged by the psychiatric center on September 11, 1975. This was

followed with treatment and medication in family care until September 1, 1976. She continues to see Dr. Gorlicki, a psychiatrist, whom she testified she still needs.

On November 26, 1976, the infant was surrendered by the appellant to the Clinton County Department of Social Services for adoption, at which time she executed a written surrender document. On January 6, 1977, he was placed in the home of prospective adoptive parents.

On February 9, 1977, the appellant commenced a proceeding to revoke the surrender document dated November 22, 1976. After a hearing held on March 10, 1977, Family Court denied the application. On appeal, this court reversed and remitted the matter to the Family Court for further proceedings *(Matter of Franciska GG v Duquette,* 64 AD2d 787).

On October 2, 1978, the appellant petitioned Family Court for the termination of his placement for adoption, and the Department of Social Services of Clinton County counterclaimed, pursuant to section 384-b of the Social Services Law, for an order committing the guardianship and custody of the infant to the Commissioner of Social Services of Clinton County on the ground that he was a permanently neglected child, and on the further ground of the mental illness of his mother. The prospective adoptive parents intervened and joined in the request of the Department of Social Services.

During the progress of the hearings, Family Court on November 3, 1978, determined that there had been an effective revocation of the surrender document. At the conclusion of the hearings, the Family Court considered the testimony in conjunction with the pertinent statutory provisions and determined that the appellant "suffers from a mental illness of such a nature and to such an extent that she cannot foreseeably care for the child in anywhere near an appropriate or beneficial manner during that youngster's formative years" and that she has permanently neglected the child. Family Court then ordered that the guardianship and custody rights of the parent be transferred to the Clinton County Department of Social Services, and authorized and empowered the department to consent to the adoption of the infant subject to the order of a court of competent jurisdiction, without the consent of or further notice to appellant.

Appellant contends that the finding of Family Court as to the parent's mental illness was arbitrary, capricious and an abuse of discretion in that although she was once diagnosed as

a paranoid schizophrenic, at the present time she is in remission and no court should remove a child from a parent in remission.

The psychiatrist who examined her pursuant to a court order testified that there had been a good remission in her mental illness, and the term remission means improvement. He also testified that change could occur according to the stress that the individual was under, and that if she found herself again in a community with no friends and no family and no means of support, coupled with the responsibility of a child, she might, under that kind of stress, have a recurrence of her illness. In addition, the evidence indicates that she continues to see Dr. Gorlicki, a psychiatrist, once a week because life in this country is very difficult for her, and she continues to receive Social Security disability payments as a result of letters written to the Social Security office by Dr. Gorlicki.

Lest there should be any doubt about the matter, this record unequivocally establishes that the mother was not disabled by any acute mental illness at the time of the hearings herein. It was speculated that if the child was returned to her she might become mentally ill, but there was no allegation of present danger of illness if a plan to reintegrate the mother and child was implemented. However, there was no plan to return custody to the mother following her acute illness. Indeed, the illness occurred in an acute form just as the infant was returned to her on June 20, 1975, about five months after the initial surrender.

The finding of the Family Court on the issue of mental illness was against the weight of the evidence and there is no support for a termination of parental rights based on mental illness (see *Matter of Thomas TT.,* 67 AD2d 788; cf. *Matter of Suzanne N.Y.,* 66 AD2d 723).

There is also a dearth of proof to establish permanent neglect. Any plan by the mother for herself and her child's future was nearly impossible on and after the surrender for adoption because the respondent refused to recognize her legal right to revoke that surrender. Results which flow naturally from the intransigence of the agency having custody of a child should not be utilized to support findings against a single parent (see *Matter of Sanjivini K.,* 47 NY2d 374, revg 63 AD2d 1021; cf. *Matter of Leon RR,* 66 AD2d 118).

"The State's first obligation is to reunite a child with his

family when he has left home (Social Services Law, § 384-b, subd 1, par [a], cl [iii]). Upon this record, we are unable to say that the Agency has complied with this obligation." *(Matter of Anita "PP", 65 AD2d 18, 24.)*

The order should be reversed, on the law and the facts, with costs to the appellant, the petition granted to the extent of revoking the placement of the infant for adoption, the counterclaims seeking a termination of parental rights dismissed, and the matter remitted to the Family Court of Clinton County for further proceedings as to custody of the infant.

MAHONEY, P. J., SWEENEY, KANE and STALEY, JR., JJ., concur.

Order reversed, on the law and the facts, with costs to appellant, petition granted to the extent of revoking the placement of the infant for adoption, counterclaims seeking a termination of parental rights dismissed, and matter remitted to the Family Court of Clinton County for further proceedings as to custody of the infant.