*486 OPINION OF THE COURT
Nanette Dembitz, J.
This foster care proceeding presents the question of how best to achieve a stable familial relationship for a séven-yearold girl who spent her first five years (except for a few days) in the home of the intervenors, her former foster parents, Mr. and Mrs. Ruiz; was then returned to respondent, her biological mother, for 14 months; and then was placed by the Commissioner of Social Services because of her mother’s neglect in the home of different foster parents where she has resided for the past year. Litigation over the custody of the child, Deborah, which began in 1974, is now before this court as the result of the Appellate Division’s reversal in June, 1978 of an order made by another Judge of this court in December, 1976 (63 AD2d 949) directing Deborah’s return to her mother from her former foster parents, the Ruiz’.[1]
The Catholic Home Bureau, the private agency which supervised Deborah’s foster care by the Ruiz’, as well as the natural mother’s care of the child after her return from them, and the attempts to rehabilitate the mother during both those periods, urges this court to direct resumed foster care by the Ruiz’. On the other hand, the city’s Commissioner of Social Services, who contracts with the private agencies and distributes funds to them for foster care, advocates Deborah’s continuance in her present foster home in the hope of another eventual return to the mother; the natural mother joins in this position. Only the attorney assigned as Law Guardian for the child, who has conscientiously represented her since 1976, has entirely changed his position from that he then took in favor of Deborah’s return to the biological mother. Based on continued demonstration of the mother’s fundamental incapacities, the Law Guardian now argues that return to the Ruiz’ represents the only hope of Deborah’s securing the stable, nurturing care which she urgently needs. (See Matter of Jonathan D., 62 AD2d 947, 948, as to required "consideration of Law Guardian’s report”.) After extensive testimony on this agonizing issue,[2] the court concludes on the basis of the *487 findings hereinafter stated, supplemented by more detailed findings filed herewith, that clear and convincing evidence supports the position urged by the Law Guardian (toward which the Appellate Division indicated a tentative inclination in its decision of June 27, 1978 [63 AD2d 949], remanding the proceeding for the hearing that has now been held).
i
The Commissioner of Social Services raises the preliminary issue that this court should not have obeyed the Appellate Division’s order remanding this foster care review proceeding for a new hearing. The commissioner’s argument is that Deborah is now in foster care by virtue of a Family Court order issued under a petition filed in March, 1978 against her mother for parental neglect, rather than in foster care under the provisions of section 392 of the Social Services Law, which section was the basis for the proceeding that the Appellate Division reviewed and remanded.
The commissioner’s argument must be rejected because it contradicts the clearly expressed intent of the Appellate Division’s remand. The appellate court explicitly addressed the factual and procedural point raised by the commissioner. Observing that Deborah was then in a new foster home as a result of the neglect proceeding, the Appellate Division (63 AD2d 949) criticized "the disjunctive proceedings that have afforded this child * * * little opportunity to live in a stable * * * environment.” Further, the Appellate Division made it crystal clear throughout its opinion and orders that the central issue in the remanded hearing was to be whether or not Deborah should be returned to the foster care of Mr. and Mrs. Ruiz, the then appellants. The appellate opinion reflects a concern with human relationships rather than procedural variations, effectuating the principle of Matter of Sanjivini K. (40 NY2d 1025, 1027), that the Appellate Division has discretion, regardless of the various types of past or pending proceedings, to exercise "ingenuity and energy * * * to make appropriate provision for her [the child’s] welfare.”
There is no inconsistency between the order in the neglect proceeding for foster care in general, and consideration of *488 whether Deborah should be returned to the foster care of Mr. and Mrs. Ruiz. The later issue — that is, the particular foster care that Deborah should be afforded — was not considered in the neglect proceeding nor could it be under customary Family Court procedure. The Appellate Division order harmonizes the Family Court Act’s neglect provisions with the rights accorded under section 392 of the Social Services Law to foster parents of over 18 months’ duration to assert their view of the foster child’s best interests. The Family Court’s "continuing jurisdiction under the provisions of subdivision 10 of section 392 of the Social Services Law” to review foster care arrangements, is a significant basis for action for the welfare of a child, regardless of what other proceedings are brought. (See Matter of Anonymous [St. Christopher’s Home], 48 AD2d 696, 697, revd on other grounds 40 NY2d 96.) Nor is it unusual for the Family Court’s jurisdiction over a proceeding to continue even if an inconsistent order has been entered in a later initiated proceeding — a more extreme situation than that at bar.[3]
Finally, the commissioner’s contention that he alone has the authority to determine with what foster parents a child should reside, ignores the court’s authority regarding long-term foster parents under section 392 of the Social Services Law. As stated in People ex rel. Ninesling v Nassau County Dept. of Social Servs. (46 NY2d 382, 390), in connection with a related provision of the Social Services Law, "at the expiration of an extended period of foster care the Department of Social Services * * * plan * * * loses something of its prima facie validity as an expression of the best interests of the child.”
In sum, the Appellate Division’s intention for this court to continue the foster care review proceedings which were before it on appeal and to hold hearings on the issue of whether seven-year-old Deborah should be returned to the foster care of the then appellants, Mr. and Mr. Ruiz, is clear not only from its language, but also from the circumstance that such intention is supported by statute and legal principle. The order herein entered is therefore within this court’s jurisdiction.
*489 II
The Appellate Division herein reiterated the principle it stated in Matter of Jonathan D. (62 AD2d 947, 948), that an inquiry pursuant to section 392 of the Social Services Law into the best interests of a child who "has been in the custody of foster parents for a prolonged period of time” requires a careful examination "into the qualifications and background of the mother.” Unfortunately, as the findings herein show, the evidence establishes clearly and convincingly that the mother will not, regardless of the services offered her, acquire the capacity to give Deborah safe and adequate care. And the court must not blind itself to the evidence, out of sympathy for the mother’s own deprivations, and thus sanction generation-to-generation victimization of children.
A
Because of her intellectual or emotional limitations and her own needs, respondent mother has from at least the time of Deborah’s birth in 1972 to the present day chronically cohabited with violent men who physically abuse her and any of her children residing with her, appropriate her public assistance funds for themselves, and command her household and her treatment of her children without regard for their welfare. Despite her acknowledgment through the years and in her testimony that these men were dangerous to her children; despite repeated attempts by social agencies to help her separate from them; and despite her repeated statements of intention to do so, she is chronically unable to stick to that intention.
Illustrative is an incident involving one Olinsky, who has a continuing current relationship and lived with the mother, both before and during Deborah’s 14 months’ return to her in 1976-1978. While Deborah and her then 10-year-old sister watched, crying and screaming, Olinsky knocked the mother down, kicked her, broke her jaw, and punched her front teeth out; he pulled the girls’ hair and hit them, bruising Deborah’s cheek and ear. Complaining to the Catholic Home Bureau that Olinsky was becoming more and more brutal, the mother asked for aid in relocating herself with her children at an address to be concealed from him — a request she had made and withdrawn after previous incidents. However, she with Deborah and her other children left a shelter for battered *490 women after a short period, before a new apartment could be found for them, and resumed living with Olinsky. Olinsky then telephoned the Catholic Home Bureau social caseworker to tell her to keep away from the home; he also refused to let the mother have a homemaker supplied by the Department of Social Services to help her. Despite the mother’s knowledge that her relationship with Olinsky is one reason for Deborah’s present placement in foster care and despite the mother’s professed desire for the child’s return, her continuance of the relationship was exposed by her admission that he was in her apartment in the midst of the remanded hearing on at least the two occasions when he gave her a fractured nose and cheekbone as well as a "black eye” and other bruises.
Besides her subservience to Olinsky and incapacity either to protect Deborah or separate from him, respondent mother demonstrated in other respects her complete inability to care for Deborah during the child’s return to her in 1976-1978. After seven months’ residence with the mother, a report in the Department of Social Services’ contemporaneous record states:[4] "Debbie continues to present as depressed and withdrawn * * * totalling lacking in spontaneity and * * * 'rocking’ herself * * * she verbalizes minimally, usually only a couple of words in response to a question * * * Debbie has regressed and her need for therapeutic involvement (play-therapy) and nursery school is critical. Mrs. S. is so needy herself she is presently unable to relate to Debbie in a maternal way. Much of the mothering tasks appear to be managed (with some resentment) by Adriana (age 10). Mrs. S. frequently acts as if Debbie were not present. She remains opposed to the idea of any kind of therapy for Debbie and while agreeing to follow up on the referral for nursery school she has not done so to date.” (Italics in original.)
Emphasizing the significance of the mother’s incapacity to protect or care for Deborah in 1976-1978 are the facts that respondent mother, through her attorney, had long sought the child’s return; that the Catholic Home Bureau had for two years attempted to aid the mother to prepare a fit home; and that the return was accompanied by renewed efforts to help respondent separate from Olinsky, as well as an array of other social services, including a full-time homemaker. Indeed, the mother’s capacity to care for her children deteriorated during *491 the period of Deborah’s return to her. When Deborah was again removed in February, 1978, those of her siblings who were not already in foster care were also removed. While the Commissioner of Social Services has refused to produce his record as to the mother’s conduct in 1977-1978, his actions speak for themselves: The commissioner removed the children to protective custody in extreme haste, without waiting to file a parental neglect petition and secure a court order (an action with only a few precedents in this Judge’s experience with hundreds of neglect cases). That Deborah and her siblings were critically endangered by the mother’s custody was confirmed by an emergency order for their foster care placement thereafter issued after hearing in the Family Court.
B
As to the possibility suggested by the attorneys for the commissioner and the mother that she could be helped through therapy to become sufficiently responsible and resourceful to care for Deborah, her history shows no such likelihood, but her lack of co-operation, perseverance or success in regard to psychotherapy. The mother’s most sustained period of treatment commenced in March, 1978, when her lawyer advised her it might aid her in her custody litigation. And she stopped, apparently again on the advice of her lawyer, in October when the therapist told her he would not testify in favor of her children’s return to her.
The opinion of the present social worker, an employee of the Angel Guardian Home who was the commissioner’s witness in the remanded hearing, to the effect that Deborah could soon be returned to her mother, is not entitled to any credence. (The commissioner allocated Deborah’s care to the Angel Guardian Home in place of the Catholic Home Bureau when she was restored to foster care, apparently because of an intra-agency dispute regarding the instant proceeding.) The social worker testified that an important basis for her opinion was that respondent had had the above-mentioned therapy from March to October, 1978; however, the therapist then testified that respondent had only attended irregularly and had not shown any basic improvement.
The Angel Guardian worker influenced the court psychiatrist towards the view that Deborah could be returned to her mother forthwith, telling him in January, 1979, according to the psychiatrist’s testimony, that the mother was then in *492 therapy and progressing; in fact she had not been in therapy since October and had not then progressed. Because of other gross factual misunderstandings disclosed in the testimony of these two witnesses as well as its superficiality, illogic, and lack of candor on the part of the Angel Guardian worker, it would be an abuse of discretion to give weight to their opinions. (As to the discretion of the trier of facts to evaluate psychiatric and other expert opinion, see, e.g., Matter of Bennett v Jeffreys, 40 NY2d 543, 549; People v Lancaster, 65 AD2d 761; Matter of City of New York [A. & W. Realty Corp.], 1 NY2d 428, 432.) Indeed, while the Angel Guardian worker-witness never disclosed her knowledge of the mother’s present conduct and the present dangers to the children in the mother’s home, she admitted towards the close of the remanded hearing that Deborah’s weekend visits to her mother — a customary step before a child’s return home — had been discontinued.
c
In sum, the evidence is clear and convincing that Deborah, if returned to respondent mother, would suffer from the same type of abuse by the latter’s male companion and the same neglect by the mother as she suffered when she was returned from 1976 to 1978. And the tragic life of her sister, now age 12, who was returned to the mother from foster care at about Deborah’s present age, foreshadows the life Deborah would have with her mother. The court therefore finds that Deborah will need foster care for years to come, probably to her majority, to avoid another round of violence, neglect, chaos, and danger in respondent mother’s home.
hi
At the time Deborah was ordered into her mother’s home in December, 1976 after her first five years of life with the Ruiz’, she was a healthy, normally adjusted and developing child. According to the report and testimony of the court psychologist who examined her in January, 1979, and other credible evidence, Deborah continues to show symptoms of the anxiety, sadness and withdrawal that she manifested during her return to her mother, despite the therapy she has had since then and her present foster care; she is unresponsive and *493 cannot grasp instructions suitable for her age; her development is that of a four- to five-year-old child (the age at which she left the Ruiz’); her intelligence tests in the defective range (an average of 49) so that the psychologist suspected not only poor functioning but congenital defect.
Considering Deborah’s concededly dire need for stability to foster her development to her potential, the issue is whether it can best be secured by her return to the Ruiz’. Her present foster home is the one where she was placed on a temporary emergency remand basis in March, 1978; the foster mother, an elderly woman, has been used by Angel Guardian Home for many years largely for temporary placements, having had a total of 187 children in her care. If Deborah is not returned to the Ruiz’, she probably will be subjected to transfers over the years from one foster home to another or to one or another institution; for such is the frequent fate of long-term foster children (see Smith v Organization of Foster Families, 431 US 816, 837, as to the subjection of foster children to the instability of transfers from home to home). With Deborah’s confused, disturbed, and retarded state, this prospect is especially grievous. Nor is it likely that any other foster parent would give as affectionate and patient care to this now disturbed child as is expectable from Mr. and Mrs. Ruiz.
The Ruiz’, whose bond with Deborah grew while they helped her develop from a new born, sick infant undergoing heroin withdrawal, to an affectionate child of five, are eager to aid her for as long as she needs them; and they are experienced in giving long-term care to foster children. A working class couple in their 40’s, they have a stable, close, affectionate family life. Their two biological sons, both of whom live at home and attended the remanded hearing, are respectively an insurance company employee and a premedical student at Fordham University. While Mrs. Ruiz was described in contemporaneous reports as over protective of Deborah, she was nevertheless able to aid the child to develop a normal degree of independence. Return to the Ruiz’ now is, the court believes, Deborah’s last best hope for stable, nurturing care and "psychological progress.”[5]
The court finds that Deborah’s statements to various witnesses in this proceeding as to her antipathy and fear of the Ruiz’ are solely and completely due to brainwashing against *494 them;[6] and that her bond with the Ruiz’ will be re-established upon her return to them, to her benefit.
As to Deborah’s continued visits with her mother, this court agrees with the Law Guardian’s view that Mrs. Ruiz would cooperate in assuring them, as well as visits with her siblings. It is true, as pointed out by the commissioner, that Mrs. Ruiz wrote a number of letters to Deborah (which were intercepted by the Department of Social Services) expressing love and longing for her and sorrow at their separation. Despite the emotionality of the letters (perhaps reflecting an Hispanic cultural style), the more significant point in appraising Mrs. Ruiz’ attitude towards the mother, is the fact that these letters were written only after Deborah was removed from her mother because of her neglect and placed in foster care with strangers. Indeed, the Ruiz’ did not even perfect their appeal from the 1976 order returning Deborah to her mother (the order which was reversed by the Appellate Division) until she had been removed from the mother.
Under the mandate of the Appellate Division and of section 392 of the Social Services Law to consider Deborah’s best interests, her return to the Ruiz foster home is directed. The Ruiz’ attorney prays in addition for a direction to the agency to file a petition to terminate the mother’s parental right to Deborah so that, if the petition were granted, she can have the security not only of foster care but of adoption by the Ruiz’. The mother’s conduct shows a failure to plan in an effective and feasible manner for Deborah’s return to her care, and thus supplies the basis for filing such a petition in accordance with article 6 of the Family Court Act. Nevertheless, the court will deny the prayer at this time and direct that this proceeding be continued until October 15, 1979 for further review of Deborah’s progress and status.

. The appellants, Mr. and Mrs. Ruiz, let their appeal lie dormant until March, 1978 when Deborah was again moved into foster care because of her natural mother’s neglect.

. Because of the insufficiency of Judges, the new hearing after the Appellate Division remand was not commenced until this Judge was assigned to the foster care part in December, 1978. The 15 dates for continuances of the lengthy trial and for the *487 court’s interview with the child, were spread over four months, because of the illnesses, conflicting court engagements, or vacations of one or another of the five attorneys involved, or the court’s calendar.

. See Matter of Hunter v Hunter (41 AD2d 772, 773), as to continuing jurisdiction of the Family Court over a pre-existing support proceeding based on the existence of a marriage, after the grant of a divorce in another court. Compare Matter of Silver v Silver (36 NY2d 324).

. See Matter of Leon "RR” (66 AD2d 118, 121-122), as to admissibility of such reports as record's kept in the regular course of business.

. See Matter of Harriet J. (64 AD2d 653, 654).

. Compare Matter of Lincoln v Lincoln (24 NY2d 270, 272-273), Matter of Garber v Cooper (40 AD2d 1077), and Babin v Babin (16 AD2d 884) as to inducing a child’s reactions or statements adverse to a parent.