OPINION OF THE COURT
Carolyn E. Demarest, J.
The issue presented on motion herein concerns the placement of two brothers with the Commissioner of Social Services and whether those placements can or should be restricted by *51 the court to provide that the two infants reside with their maternal grandmother.
FACTS
Daniel Troy was born on January 18, 1986. On January 21, 1986, the Commissioner of Social Services (CSS) was notified by the hospital that Daniel’s mother had, essentially, abandoned him at the hospital. The mother was returned on a warrant on March 11, 1986, but failed to return to court thereafter, and a finding of neglect and abandonment was made following inquest on May 5, 1986.
On May 23, 1986, the Commissioner was not prepared to present an investigation and report (I and R) on this child as ordered. The Law Guardian was able to report, however, that there had been no contact between the child and the respondent mother since remand of the child to the Commissioner. Based upon this information, the Law Guardian’s application for an 18-month placement with the Commissioner was granted and a direction given to place the child in a preadoptive home and commence a termination proceeding as soon as practicable.
Eighteen months later, CSS filed to extend Daniel’s placement. On November 23, 1987, the caseworker stated, in response to the court’s questions, that he had no idea where the child was residing or the status of the termination proceeding. Process was issued and the direction to commence termination if the mother had not participated in planning for the child was renewed. Placement was temporarily extended until December 11.
On December 11, in the absence of any information that the mother had visited Daniel, and with the consent of the Law Guardian, placement was extended for 12 months. Again the court directed that the child be placed in a preadoptive home and a termination proceeding be commenced "forthwith”. CSS was directed to report to the court by February 16.
Apparently unbeknownst to CSS personnel responsible for the case of Daniel Troy, on October 16, 1987, Daniel’s mother gave birth to a second son, Prince Daniel (Prince), who also was taken into the care of CSS within days after his birth, based upon the mother’s drug use.
In fact, on November 13, 1987, when Prince’s case was filed, the court cautioned CSS counsel of the need to file an extension for Daniel. This warning was repeated on November 20, *52 1987. CSS counsel responded that he had tried to contact the caseworker and "three levels of supervisors” regarding this problem, to no avail.
At inquest on December 11, 1987, Prince was found to be neglected and abandoned pursuant to Family Court Act § 1059. An I and R was ordered for February 16, 1988.
The I and R offered on February 16 indicated that the natural mother had been interviewed, together with the maternal grandmother, and both wanted to have the children placed in the care of the maternal grandmother while the mother attended a residential drug treatment program. It was noted that the father of both children had been identified.
Finding the report inadequate for dispositional purposes* the court ordered a supplemental I and R, to include an evaluation of the grandmother’s home.
On March 17, 1988, an I and R was presented recommending that the child Prince not be placed with the maternal grandmother because her apartment was too small, notwithstanding that she was "potentially” considered to be a suitable caretaker and had been visiting the children biweekly. The Law Guardian disagreed with this recommendation and, after much negotiation and phone calls to supervisors, it was agreed between the Law Guardian and CSS that it would be in the best interests of the child Prince to reside with his maternal grandmother through a CSS placement. The Law Guardian requested that the placement order provide "to reside with the maternal grandmother.” CSS objected to such restriction. The parties were directed to brief the issue.
On May 11, 1988, the Law Guardian brought on a motion to modify the extension of placement order for Prince’s brother, Daniel, entered December 11, 1987, to also provide that Daniel reside with his maternal grandmother, Irma C., while placed in the custody of CSS. Both children are actually already in the care of their maternal grandmother.
DISCUSSION
The issue in both cases is the same: Does the Family Court have the authority, upon placing a child in the custody of the Commissioner of Social Services, to direct that the child reside with a particular individual where that individual has been approved as an appropriate caretaker and meets all other requirements for approval of funding?
This court is aware that State and Federal regulations do *53 restrict CSS’s choice of foster parents to those who are certified or approved. (See, 42 USC § 671 [a] [10]; § 672 [c] [1]; Social Services Law §§ 398-a, 375.) The maternal grandmother, Irma C., is, however, within the third degree of relationship to the children’s mother and has been approved as a foster parent. In light of this, Department of Social Services’ resistance to the restrictive placement is not premised upon any alleged inadequacies in the proposed foster parent, but rests entirely upon the contention that the court has no legal authority to restrict the Department of Social Services’ exercise of discretion.
The Commissioner argues that the court is vested with the discretion under Family Court Act §§ 1027, 1051 (d) and § 1055 to place a child directly with "a relative or other suitable person” as an alternative to remand or placement with the Commissioner, and that such express authorization precludes a restrictive placement through the Commissioner. He supports this argument with reference to Family Court Act § 756 which specifically provides for placement of a person in need of supervision (PINS) with the Commissioner for a particular agency. The analogy is, however, inapposite in that the PINS proceeding, unlike the neglect proceeding, is quasi-penal in nature and the need for placement arises out of willful acts of the juvenile. Under such circumstances, the Legislature understandably found it necessary to provide specific procedures for controlling placement, so that the respondent child might be assured of the least restrictive and most appropriate institutional (agency) care and treatment. While CSS is also required to provide treatment, where necessary, to a subject child (not a "respondent”) in a neglect proceeding, the issue here concerns only placement with a particular foster caretaker in a private home. Services other than daily care are supplied through a foster care agency independently, irrespective of who the foster parent is.
It is true, of course, that the court is authorized to place a child directly with an appropriate caretaker under Family Court Act § 1055. The Law Guardian objects to this alternative in the instant case, despite her advocating that the children should be placed with their grandmother, primarily because she believes the family would not be adequately supervised and assisted were custody not given to CSS. In addition, as she noted at argument, she is concerned that, at the end of the initial 18-month placement, the child would be left in limbo, as the caretaker, without CSS assistance, would *54 not be in a position to see an extension of the placement if necessary.
An equally compelling reason for the requested placement with CSS, though not emphasized by the Law Guardian in this case, is the significantly greater financial support available for the child if placed with the Commissioner of Social Services than if placed directly with a nonrespondent caretaker. The court takes judicial notice of the daily application by Legal Aid Law Guardians that "Eugene F. ” funds be promptly provided to a custodial foster parent, and the frequent arguments by Law Guardians upon disposition for placement with CSS of a child who may have been residing for years with a relative, with the understanding that the child will continue to reside with that relative, in order to secure "Eugene F. ”[1] funds for that custodian.
While arguing that this issue is "irrelevant” to the question before the court, CSS acknowledges that average foster care rates vary from a minimum of $12 per day per child to in excess of $25 per day per child, as contrasted with approximately $40 per week per person for public assistance. Conservatively, the funding available to a foster parent is approximately twice that available to the custodian of a child under public assistance, assuming the custodian is eligible for such assistance. Legal Aid counsel have advised the court generally that "Eugene F. ” funds (foster care rates) are usually close to three times the public assistance funds available. Under such circumstances, it is entirely appropriate for the child’s lawyer to advocate placement with CSS in order to secure the maximum financial benefits for his or her client while, at the same time, seeking to ensure that the child will remain with relatives or prior caretakers with whom the child has already developed a loving and secure relationship. Often the proposed caretaker would not be able to continue to care for the child without foster care funds.
Public policy expressed in both the Family Court Act and the Social Services Law demands that every effort be made to avoid removing a child from his natural parents. Where such removal is unavoidable, placement with other relatives is preferred over placement with strangers.
Though in the case at bar respondent mother has never been an active participant, in many cases, a respondent par *55 ent will, upon disposition, consent to the placement of his or her child with CSS with the understanding that the child will remain with a family member, rather than litigate the disposition. Such conditional consent should be binding upon both the respondent and the Commissioner. Entry of a placement order restricting the placement to reside with a specified individual expresses that agreement and provides standing to respondent and Law Guardian to take legal action should the child be removed from that individual. Without such a restriction, CSS retains the absolute, unfettered discretion to place the child with whomever it wishes as long as the foster parent meets CSS standards and to remove the child whenever the caseworker determines it is appropriate to do so.
The two infants at issue here, like a great many of the children who come before this court, have spent their entire lives in the care of the Commissioner of Social Services. Unfortunately, their grandmother was not located immediately. (It is possible that she did not even know they existed since they were removed from the hospital shortly after birth.) It is critical, therefore, that these children be placed with their natural family as soon as possible so as to promptly integrate them into their natural family and to avoid the later trauma to them of being severed from a foster caretaker with whom they may have bonded. (Cf., Matter of Kevin R., 112 AD2d 462 [3d Dept 1985].) This court believes that part of its mandate under Family Court Act §§ 255 and 1055, in the particular circumstances of this case, is to ensure that these children will not be arbitrarily removed from their natural family without an opportunity for judicial review of the reasons for such removal. A restrictive placement appears to be especially necessary in this case in light of the Commissioner’s initial reluctance to place the children in their grandmother’s care for fairly inconsequential reasons.[2]
*56 In most neglect proceedings where foster care is necessary, it is not feasible, nor would it be appropriate, for the court to direct placement with a particular foster family. That does not mean, however, that the court is without power to do so. Certainly, this court has no lesser duty to guard the best interests of a neglected or abused child than those of a person adjudicated to be in need of supervision due to his own willful conduct.
The Law Guardian contends that Family Court Act §§ 141 and 255 confer broad powers upon the Family Court to fashion orders designed to protect the best interests and particular needs of children within the court’s jurisdiction. CSS contends that Family Court Act § 255 does not authorize the proposed restriction upon its exercise of discretion.
CSS is clearly a governmental agency within the meaning of section 255. Not only was it on notice of the instant application and given a full opportunity to present its case, but it is also the petitioner who initiated and prosecuted the cases against the mother of these children. There can be no resistance to the Law Guardian’s application on jurisdictional or procedural grounds, and none has been raised.
Literally, section 255 not only confers upon the Family Court the broad power to direct the assistance and cooperation of governmental agencies, but such direction is made the duty of the Family Court Judge when it is deemed necessary to enhance the welfare of the child.
In fact, though CSS argues to the contrary, Family Court Act § 1055 (c) expressly authorizes the making of an order directing "a specific plan of action” to be undertaken by CSS in the interests of encouraging and strengthening the parental relationship. Reference is specifically made to the even broader powers of the court under section 255. Directing CSS to place a child with his grandmother certainly serves the purpose of strengthening the parental relationship.
In Matter of Lorie C. (49 NY2d 161 [1980]) the Court of Appeals analyzed the legislative intent expressed in Family Court Act § 255. Finding that the particular "sweeping plan of administration” ordered in that case exceeded the power of the Family Court to supervise executive discretion statutorily vested in the Commissioner of Social Services (a plan which vested supervision of PINS and delinquents in placement in the Probation Department in contravention of powers conferred upon CSS under Social Services Law § 398), the court, *57 nonetheless, both explicitly and implicitly indicated that the Family Court is empowered under section 255, "in the proper circumstances”, not only to fashion an order related to the "immediate needs of a particular child”, such as the order at issue here, but even to enter an order extending beyond such limitations (49 NY2d, supra, at 171-172 [Gabrielli, J., concurring]).
Petitioner cites Matter of Richard SS. (87 AD2d 915 [3d Dept 1982]) as prohibiting the Family Court from granting the relief requested here. That case is significantly distinguished from this, however, by the legal inconsistency inherent in the Family Court’s order directing placement of a child with a governmental agency while, at the same time, directing that the child remain in the care of his natural parents. Either one or the other alternative is authorized under Family Court Act § 1055. But where respondent parents are capable of properly caring for their children, even if CSS supervision is necessary, it is contrary to public policy and statutory mandate to remove the child from his parents.
A more appropriate precedent, which supports granting the Law Guardian’s application, is Matter of Stokes (77 AD2d 492 [1st Dept 1980], affg 100 Misc 2d 485 [Fam Ct, NY County 1979]). Deborah Stokes was a child with special needs for emotional support and psychiatric treatment following a long history of abuse and neglect by her mother and various paramours of her mother. Judge Dembitz of the Family Court, reflecting on Deborah’s regression following removal from the home of her original foster family, the Ruizes, determined that return to that family represented the child’s "last best hope” and directed, over the objections of CSS, the return of Deborah to the Ruizes, through CSS placement. The Appellate Division, First Department, affirmed both the findings of fact and conclusions of law reached by Judge Dembitz.
Authority on the issue at bar is divided, the Third and Fourth Departments suggesting, albeit in significantly distinguishable circumstances, that a restrictive placement through CSS is not authorized (see, e.g., Matter of James B., 96 AD2d 730 [4th Dept 1983]; Matter of Richard SS., supra), and the First Department approving such restriction in Matter of Stokes (supra). The Second Department appears not to have spoken to this issue. As it is the First Department, as a sister jurisdiction within the City of New York, which is most experienced with the operations of the petitioner herein, the New York City Department of Social Services, this court finds *58 it appropriate to rely upon the precedent from that Department. Even more compelling is the language of Family Court Act §§ 255 and 1055 which this court finds expressly authorizes the making of the requested order. (See, Matter of Lorie C., supra.)
The history of this case illustrates a problem too prevalent in neglect proceedings before this court: the failure of CSS to monitor diligently and to aggressively seek to serve the interests of children in its care. The court was particularly discouraged by the responses of the caseworker upon the application for an extension of Daniel’s placement. Despite the prior clear direction of the court, in the absence of any parental contact, to place Daniel in a preadoptive home and commence a termination proceeding, the caseworker did not even know where the child was, much less the status of any legal proceedings. Even after Daniel’s mother and grandmother were located, CSS resisted removing Daniel from the foster home of a stranger to live with his grandmother because of limited space in her apartment. CSS changed its position under pressure from the Law Guardian, but, presumably, had discretion been vested exclusively in CSS, Daniel and Prince would still be separated from each other and their natural family.
Daniel and Prince have a natural family ready, willing and concededly able, to care for them. They also have each other. It is agreed by all parties that they should be placed in the home of their grandmother. The court cannot ensure that they will not be moved without good and sufficient reason without granting the requested restrictive placement order.
Accordingly, the Law Guardian’s motion is granted and, in the best interests of both children, Prince Daniel C. is placed with the Commissioner of Social Services for a period of 15 months, to expire November 22, 1989, to reside with his maternal grandmother, Irma C. The order extending placement for Daniel Troy C., entered December 11, 1987, is modified to provide that he shall also reside with his maternal grandmother, Irma C., through placement with the Commissioner of Social Services.

. Refers to litigation in Matter of Eugene F. (index No. 1125/86 [Sup Ct, NY County]) which resulted in the promulgation of new regulations by CSS.

. The reason cited for this reluctance was the lack of space in the grandmother’s apartment. This, unfortunately, is not an uncommon problem in the City of New York and there are, in fact, many children in foster care for no reason other than their parent’s inability to locate adequate housing. The "Catch 22” of this problem is that adequate living space in public housing will not be granted unless the children are in the applicant’s care. Thus, as long as the children are in foster care, the parent will be denied the housing he or she needs to have the children returned. As the grandmother of Prince and Daniel is already on the list for a larger apartment, it is possible that having her grandsons in her care may actually facilitate the resolution of her housing problem. Conversely, the failure to place them in her care is very likely to perpetuate the very impediment to her gaining custody of them.